**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

BARRY LEE JONES,
*Petitioner-Appellee*,

v.

DAVID SHINN, Director;
STEPHEN MORRIS, Warden,
Arizona State Prison-Eyman
Complex,
*Respondents-Appellants*.

No. 18-99006

D.C. No.
4:01-cv-00592-TMB

OPINION

Appeal from the United States District Court
for the District of Arizona
Timothy M. Burgess, Chief District Judge, Presiding

Argued and Submitted June 20, 2019
San Francisco, California

Filed November 29, 2019

Before:  Johnnie B. Rawlinson, Richard R. Clifton,
and Paul J. Watford, Circuit Judges.

Opinion by Judge Clifton

# SUMMARY[*]

## Habeas Corpus

The panel affirmed in part and vacated in part the district court's grant of federal habeas relief to Barry Lee Jones, a state prisoner who was sentenced to death following his conviction for one count of sexual assault, three counts of child abuse, and felony murder for the death of four-year-old Rachel Gold.

The panel held that 28 U.S.C. § 2254(e)(2), which precludes evidentiary hearings on claims that were not developed in state court proceedings, did not prohibit the district court from considering the evidence adduced at a hearing pursuant to *Martinez v. Ryan*, 566 U.S. 1 (2012) (concerning cause to excuse procedural default), to determine the merits of Jones's underlying ineffective-assistance-of-counsel claim.

The panel also concluded that the district court did not err in determining that (1) the assistance provided by Jones's counsel was constitutionally deficient because he failed to perform an adequate pretrial investigation into whether Rachel's injuries were sustained during the time she was alone with Jones, and (2) Jones has demonstrated prejudice due to counsel's failures.

The panel therefore generally affirmed the order of the district court that granted Jones habeas relief on the guilt-

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

phase portion of his IAC claim and ordered the State to release him from custody unless it initiated new trial proceedings against him. However, on one of the five counts of conviction, regarding Jones's failure to seek medical care for the victim (Count Four), the panel concluded that the ineffective assistance only affected the jury's classification of Jones's offense as intentional or knowing but not his underlying guilt based on a less culpable mental state, such as recklessness. The panel therefore affirmed the district court's grant of Jones's habeas petition but vacated in part its remedy. The panel instructed the district court on remand to amend its order to require that the state court either retry Jones on Count Four or resentence him on that count for the lesser included offense of reckless misconduct.

## COUNSEL

Myles A. Braccio (argued), Assistant Attorney General; Lacey Stover Gard, Chief Counsel; Mark Brnovich, Attorney General; Capital Litigation Section, Office of the Attorney General, Phoenix, Arizona; for Respondents-Appellants.

Cary Sandman (argued) and Karen Smith, Assistant Federal Public Defenders; Jon M. Sands, Federal Public Defender; Office of the Federal Public Defender, Tucson, Arizona; for Petitioner-Appellee.

## OPINION

CLIFTON, Circuit Judge:

A warden and several other employees of the State of Arizona (collectively the "State") appeal the grant of federal habeas relief to Barry Lee Jones, a state prisoner under sentence of death. Jones was convicted of one count of sexual assault, three counts of child abuse, and felony murder for the death of four-year-old Rachel Gray. *Jones v. Ryan*, 327 F. Supp. 3d 1157, 1163–64 (D. Ariz. 2018) ("*Jones Habeas*"). To determine whether Jones qualified for habeas relief, the district court considered evidence presented at hearings to determine whether Jones could establish cause to excuse the procedural default of a claim of ineffective assistance of counsel ("IAC") pursuant to *Martinez v. Ryan*, 566 U.S. 1 (2012) ("*Martinez* hearing"). *Id.* at 1163. It then concluded that Jones had established cause to excuse the procedural default of his meritorious guilt-phase IAC claim that trial counsel failed to sufficiently investigate the police work, medical evidence, and timeline between Rachel's fatal injury and her death (Claim 1D), and it therefore granted his habeas petition. *Id.* at 1163, 1168.

We hold that 28 U.S.C. § 2254(e)(2), which precludes evidentiary hearings on claims that were not developed in state court proceedings, did not prohibit the district court from considering the evidence adduced at the *Martinez* hearing to determine the merits of Jones's underlying IAC claim. When a district court holds an evidentiary hearing to determine whether a petitioner's claim is excused from procedural default under *Martinez*, it may consider that same evidence to grant habeas relief on the underlying claim.

We also conclude that the district court did not err in determining that (1) the assistance provided by Jones's counsel was constitutionally deficient because he failed to perform an adequate pretrial investigation into whether Rachel's injuries were sustained during the time she was alone with Jones, and (2) Jones has demonstrated prejudice due to counsel's failures. At Jones's trial, the State presented evidence that established that most of Rachel's injuries, including her fatal injury, were consistent with infliction on Sunday, May 1, 1994, between 2:00 p.m. and 5:30 p.m, a few hours before she was pronounced dead the next morning. *Jones Habeas*, 327 F. Supp. 3d at 1169. The State also presented evidence from several witnesses that supported its theory that Rachel was in the sole care of Jones during that time. *Id.* at 1173–74. At the *Martinez* hearing, Jones presented evidence, both from his own experts and from a government expert's prior statements, that Rachel may have in fact been injured earlier. *Id.* at 1179–80. He also presented evidence of other potential suspects who had access to Rachel outside the critical disputed hours, including her mother, other children in the trailer park, her siblings, and her mother's former boyfriend. *Id.* at 1188–89. Although this evidence would not necessarily exonerate Jones, there is a reasonable probability that the jury might have arrived at a different conclusion on the question of whether Jones had inflicted the injuries or knowingly failed to seek care. We generally affirm the order of the district court that granted Jones habeas relief on the guilt-phase portion of his IAC claim and ordered the State to release him from custody unless it initiated new trial proceedings against him.

However, on one of the five counts of conviction, regarding Jones's failure to seek medical care for the victim (Count Four), the ineffective assistance only affected the

jury's classification of Jones's offense as intentional or knowing but not his underlying guilt based on a less culpable mental state, such as recklessness. We therefore affirm the district court's grant of Jones's habeas petition but vacate in part its remedy. The district court should amend its order to require that the state court either retry him on Count Four (as its order currently states, 327 F. Supp. 3d at 1218) or resentence him on that count for the lesser included offense.

## I.  Background

In April and early May 1994, Jones shared his trailer with his girlfriend Angela Gray, his 11-year-old daughter Brandie Jones, and Angela's three children: four-year-old Rachel Gray, 11-year-old Rebecca Lux ("Becky"), and 14-year-old Jonathon Lux.[1] *Jones Habeas*, 327 F. Supp. 3d at 1163, 1181. At approximately 6:15 a.m. on Monday, May 2, 1994, Jones drove Rachel and Angela to Kino Community Hospital in Tucson, Arizona. *Id.* at 1163. Rachel was admitted and pronounced dead on arrival, caused by a small bowel laceration due to blunt abdominal trauma. *Id.* Rachel also had a laceration to her left scalp, injuries to her labia and vagina, and multiple internal and external contusions. *Id.*

Jones was arrested and charged with:

> (1) engaging in an act of sexual intercourse with Rachel, in violation of A.R.S. § 13-1406 (Count One); (2) causing physical injury to Rachel by striking her abdominal area causing

---

[1] Because Angela and Rachel have the same last name, we will refer to them by their first names. We will likewise refer to Rebecca Lux as "Becky," Jonathon Lux as "Jonathon," and Brandie Jones as "Brandie."

a rupture to her small intestine under circumstances likely to produce death or serious physical injury, in violation of A.R.S. § 13-3623(B)(1) (Count Two)[2]; (3) causing physical injury to Rachel by bruising her face and ear and causing a laceration to her head, in violation of A.R.S § 13-3623(C)(1) (Count Three); (4) causing Rachel to be placed in a situation where her health was endangered under circumstances likely to produce death or serious physical injury, in violation of A.R.S. § 13-3623(B)(1) (Count Four); and (5) felony murder, in violation of A.R.S. § 13-1105 (Count Five)

*Jones Habeas*, 327 F. Supp. 3d at 1163.

Under Arizona law, first degree murder can either be (1) premeditated, meaning the defendant intentionally or knowingly caused the death of another with premeditation, or (2) felony murder, if the defendant caused a death during the commission of or in furtherance of enumerated predicate felony offenses. A.R.S. § 13-1105(A) (1994). Those enumerated predicate offenses include sexual assault (as charged in Count One) and child abuse under § 13-3623(B)(1) (as charged in Counts Two and Four). *Id.* § 13-1105(A)(2); *State v. Styers*, 865 P.2d 765, 771 (Ariz. 1993) (In Banc); *Jones Habeas*, 327 F. Supp. 3d at 1212.

---

[2] Unless otherwise noted, all references to A.R.S. § 13-3623 are to the version of the statute in effect at the time Jones was charged and convicted. The statute was revised in 2000 so the section under which Jones was convicted, § 13-3623(B)(1), is now § 13-3623(A)(1). *See* 2000 Ariz. Legis. Serv. Ch. 50 (H.B. 2395) (West).

Jones was only charged under a felony murder theory. *Jones Habeas*, 327 F. Supp. 3d at 1163.

In Counts Two and Four, Jones was also charged with the lesser included offenses of child abuse committed recklessly, A.R.S. § 13-3623(B)(2), and child abuse committed with criminal negligence, A.R.S. § 13-3623(B)(3). The trial judge explained that the child abuse charges could only be predicate felonies for felony murder if Jones committed them intentionally or knowingly under circumstances likely to produce death or serious physical injury. *Jones Habeas*, 327 F. Supp. 3d at 1212.

The day after Jones's arrest, May 3, Sean Bruner was appointed to represent Jones. *Id.* at 1168. Bruner's partner Leslie Bowman also represented Jones as an informal "second-chair" attorney, although she was never formally appointed by the trial court. *Id.*

Angela was also charged on Counts Four and Five of the same indictment. *Id.* at 1163. She was tried separately, prior to Jones's trial, and she was convicted on Count Four. *Id.* Because the jury determined she had acted recklessly in failing to render care, rather than intentionally or knowingly, she was ineligible for felony murder and therefore acquitted on Count Five. *Id.* at 1163–64.

Jones was tried before a jury in April 1995. *Id.* at 1164. The trial judge instructed the jurors that the sexual assault charge (Count One) and two of the child abuse charges (Counts Two and Four) could be predicate felonies for the felony murder charge (Count Five) if Jones committed them intentionally or knowingly under circumstances likely to produce death or serious physical injury. *Id.*

On April 14, 1995, Jones was convicted of one count of sexual assault, three counts of child abuse, and felony murder. *State v. Jones*, 937 P.2d 310, 313 (Ariz. 1997) ("*Jones State*"). The jury did not specify which specific felony or felonies—out of Counts One, Two, and Four—it found as a predicate for felony murder under Count Five. The jurors found that both child abuse charges that qualified as predicate felonies were committed intentionally or knowingly under circumstances likely to cause serious physical injury or death. *Jones Habeas*, 327 F. Supp. 3d at 1164.

After finding two statutory aggravating factors—that the crime was especially cruel, A.R.S. § 13-703(F)(6), and the victim was under the age of fifteen, A.R.S. § 13-703(F)(9)—and no statutory or non-statutory mitigating factors, the trial judge sentenced Jones to death for the murder.[3] *Jones State*, 937 P.2d 310 at 313. The trial court sentenced him to a term of 27 years on Count One, 35 years on Count Two as a class two felony, 3.75 years on Count Three, and life imprisonment on Count Four as a dangerous crime against children in the first degree with two prior predicate felony convictions. A.R.S. §§ 13-604.01(F), 13-604.01(J)(1)(h) (1994).

The Arizona Supreme Court affirmed Jones's convictions and sentences. *Jones State*, 937 P.2d at 313. It noted that the following evidence linked Jones to Rachel's injuries: on the

---

[3] Prior to the Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584, 589 (2002), trial judges in Arizona determined mitigating and aggravating circumstances and decided whether a death sentence should be imposed. In *Ring*, the Supreme Court held that this procedure violated the Sixth Amendment. *Id.* However, *Ring* does not apply retroactively. *Schriro v. Summerlin*, 542 U.S. 348, 358 (2004).

day she received her injuries, Jones left his trailer three times with Rachel in his van; two children saw Jones hitting her while he drove; Jones stopped at a Quik-Mart to get ice for Rachel's head injury; and police found traces of Rachel's blood type on his clothing and in his van. *Id.* While visiting Jones's trailer that evening, a friend's son asked Jones about Rachel's condition, and Jones falsely stated that he had taken her to get examined by paramedics at the fire department. *Id.* The court held that the evidence at trial was sufficient to sustain a guilty verdict on the sexual assault charge in part because "substantial evidence was introduced to conclude that Rachel's physical assault and sexual assault all occurred within the two-hour time period during which she was alone with defendant in his van." *Id.* at 318–19.

Jones filed a petition for post-conviction relief ("PCR"), which included IAC claims based on defense counsel's alleged failures to seek mistrial after three jurors saw him in handcuffs, interview Angela, follow-up on his request for a second attorney, meet with Jones enough times to adequately prepare for trial, and explicitly inform Jones of his right to testify in his own defense. After holding an evidentiary hearing, the trial court denied his petition. *Jones Habeas*, 327 F. Supp. 3d at 1165. The Arizona Supreme Court summarily denied his petition for review. *Id.*

Jones initiated federal habeas proceedings on November 5, 2001, and he filed an amended petition on December 23, 2002. *Id.* Claim 1D of his habeas petition alleged in part that counsel was ineffective for failing to conduct sufficient trial investigation; adequately investigate the police work, medical evidence, and timeline of death versus injury; and conduct sufficient mitigation investigation

for sentencing. *Jones v. Schriro*, No. CV01-592-TUC-FRZ, 2008 WL 4446619, at *5 (D. Ariz. Sept. 29, 2008).

Under the doctrine of procedural default,

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991). The district court determined that the majority of Claim 1D was procedurally defaulted because it had not been raised and exhausted in state court. *Jones v. Schriro*, 2008 WL 4446619, at *2, *5. As cause to excuse the procedural default of Claim 1D, Jones alleged that PCR counsel was ineffective for failing to present this claim in state court. Order, *Jones v. Schriro*, No. CV01-592-TUC-FRZ, at 9 (D. Ariz. Sept. 27, 2004), Dkt. 115. Following then-governing Supreme Court precedent, the district court determined that PCR counsel's purported ineffectiveness did not constitute cause because "there is no constitutional right to counsel in state PCR proceedings." *Jones v. Schriro*, 2008 WL 4446619, at *5. The court ordered supplemental briefing regarding Jones's allegation that it would be a fundamental miscarriage of justice not to review the entirety of Claim 1D on the merits, and on September 29, 2008, it denied relief after concluding Jones had not demonstrated a fundamental miscarriage of

justice. *Jones Habeas*, 327 F. Supp. 3d at 1165. In doing so, it emphasized the demanding nature of the fundamental miscarriage of justice standard, and noted that while Jones's evidence was "compelling and may have been persuasive to some jurors in the first instance, it is not sufficient on collateral review to establish that no reasonable juror would have found Petitioner guilty" as required to meet this standard. *Jones v. Schriro*, 2008 WL 4446619, at *14. The court did, however, issue a certificate of appealability on its procedural ruling that Claim 1D was in part procedurally defaulted. *Id.* at *32.

While Jones's appeal from the denial of habeas relief was pending, the Supreme Court decided *Martinez v. Ryan*, 566 U.S. 1 (2012). *Jones Habeas*, 327 F. Supp. 3d at 1165. In *Martinez*, the Court held that "procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." 566 U.S. at 17. On August 19, 2014, we granted Jones's motion for a limited remand to reconsider Claim 1D in light of intervening law, including *Martinez*.

The district court ordered supplemental briefing to address whether cause existed under *Martinez* to excuse the procedural default of Claim 1D, and whether Jones was entitled to habeas relief on the claim. *Jones v. Ryan*, No. CV-01-00592-TUC-TMB, 2017 WL 264500, at *1 (D. Ariz. Jan. 20, 2017) ("*Jones Evidentiary*"). Jones sought review based on *Martinez* for Claim 1D allegations that trial counsel was ineffective for failing to investigate and present evidence to test the reliability of any of the State's evidence, including the timeline between injury and death, and failing to conduct a

reasonably sufficient mitigation investigation for sentencing. *Id.* at \*2. On January 20, 2017, the district court determined that an evidentiary hearing was necessary to determine whether Jones could establish cause to excuse the procedural default of Claim 1D. *Id.* at \*3. On October 30, 2017, it held a seven-day evidentiary hearing on the guilt-phase portion of the IAC claim. *Jones Habeas*, 327 F. Supp. 3d at 1163.

On July 31, 2018, the district court held that Jones had established cause to excuse the procedural default of his meritorious guilt-phase IAC claim that counsel failed to conduct an adequate pre-trial investigation, leading to his failure to uncover key evidence that Rachel's injuries were not sustained on the afternoon of May 1, 1994, when she was alone with Jones. *Id.* at 1200, 1218. It therefore granted his habeas petition, ordering the State to release him unless it initiated retrial proceedings within 45 days.[4] *Id.* at 1163. The state then filed a notice of appeal.[5] Dkt. No. 1. After the district court denied the State's motion to stay the district court's judgment, we granted the stay and expedited the appeal. *Jones v. Ryan*, No. CV-01-00592-TUC-TMB, 2018 WL 5066494, at \*1 (D. Ariz. Oct. 17, 2018).

---

[4] Jones also made arguments alleging ineffective assistance of counsel during the penalty phase of his trial, but the district court did not reach the merits of those claims, leaving them for consideration in the future, if necessary. *See Jones Habeas*, 327 F. Supp. 3d at 1218.

[5] "A certificate of appealability is not required when a state or its representative . . . appeals." Fed. R. App. P. 22(b)(3).

## II. Standard of Review

This court reviews de novo a district court's decision regarding habeas relief, including questions regarding procedural default. *Sexton v. Cozner*, 679 F.3d 1150, 1153 (9th Cir. 2012). Ineffective assistance of counsel claims are mixed questions of law and fact which we also review de novo. *Rhoades v. Henry*, 638 F.3d 1027, 1034 (9th Cir. 2011). "Factual findings and credibility determinations made by the district court in the context of granting or denying the petition are reviewed for clear error." *Larsen v. Soto*, 742 F.3d 1083, 1091–92 (9th Cir. 2013) (citation and internal quotation marks omitted).

## III.    Discussion

The State challenges the district court's grant of habeas relief on Jones's guilt-phase IAC claim on three grounds. First, it argues that 28 U.S.C. § 2254(e)(2) should have prevented the district court from considering evidence developed to overcome procedural default under *Martinez v. Ryan*, 566 U.S. 1, when resolving the merits of the underlying habeas claim. Second, it argues that the district court erred in granting habeas relief on all of Jones's convictions because counsel consulted with an independent pathologist before trial, the record is silent as to why counsel did not further involve the expert, the newly-proffered medical evidence was imprecise and double-edged, and strong circumstantial evidence showed Jones's guilt. Third, it argues that the district court erred by granting habeas relief on Jones's Count Four and Five convictions, based on Jones's failure to take the victim to the hospital, because these counts did not depend on the timing of the victim's injuries, and the

evidence at the *Martinez* hearing did not undermine the trial evidence proving Jones's guilt on these counts.

## A. Consideration of "New Evidence" from Martinez Hearing

Federal habeas courts should not review claims by prisoners who have not exhausted available state remedies, including when the state court concludes that the prisoner defaulted his federal claims pursuant to an "independent and adequate state procedural rule." *Coleman*, 501 U.S. at 731, 750. In *Martinez*, the Supreme Court recognized that a "federal habeas court may excuse a procedural default of an ineffective-assistance claim when the claim was not properly presented in state court due to an attorney's errors in an initial-review collateral proceeding." 566 U.S. at 5.

Jones sought review based on *Martinez* for his Claim 1D allegations that trial counsel was ineffective for (1) failing to investigate and present evidence to test the reliability of any of the State's evidence, including the medical evidence and the question of the timeline between injury and death ("guilt phase"); and (2) failing to conduct a reasonably sufficient mitigation investigation for sentencing ("sentencing phase"). *Jones Evidentiary*, 2017 WL 264500, at *2. The district court conducted a seven-day evidentiary hearing to determine whether Jones could establish cause to excuse the procedural default of Claim 1D. *Jones Habeas*, 327 F. Supp. 3d at 1163. That *Martinez* hearing included testimony and exhibits that were not previously considered by a state court, including testimony from trial and PCR counsel, several experts, and additional testimony from witnesses who testified on behalf of the State at trial. *Id*. at 1178. The federal habeas court extensively considered the evidence and argument presented

in these proceedings to conclude that (1) Jones had established cause to excuse the procedural default of his IAC claim and (2) the claim was meritorious, warranting habeas relief. *Id.* at 1163.

The State argues that 28 U.S.C. § 2254(e)(2) prevents a district court from considering new evidence developed to overcome a procedural default under *Martinez* when considering the merits of the underlying claim. That section provides:

> (2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that . . . the claim relies on . . . a factual predicate that could not have been previously discovered through the exercise of due diligence; and . . . the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2). The State argues that while § 2254(e)(2) does not bar new evidence offered to excuse a procedural default under *Martinez*, it does govern merits review and precludes an evidentiary hearing on a claim not pursued in state court. It argues that the district court therefore erred by considering evidence outside the state-court record to grant relief on Claim 1D.

As we have previously recognized and now explicitly hold, *Martinez*'s procedural-default exception applies to merits review, allowing federal habeas courts to consider evidence not previously presented to the state court. The Supreme Court explained in *Martinez* that if the prisoner's state court attorney is ineffective, "the prisoner has been denied fair process and the opportunity to comply with the State's procedures and obtain an adjudication on the merits of his claims." 566 U.S. at 11. The Court's concern was with the prisoner's opportunity to "vindicat[e] a substantial ineffective-assistance-of-trial-counsel claim," a claim which "often depend[s] on evidence outside the trial record." *Id.* at 11, 13. The Court held that the federal habeas court may hear a claim of ineffective assistance of trial counsel where the initial state collateral proceeding "may not have been sufficient to ensure that proper consideration was given to a substantial claim." *Id.* at 14.

In *Detrich v. Ryan*, 740 F.3d 1237 (9th Cir. 2013) (en banc), which did not produce a majority opinion, a four-judge plurality held that *Martinez* recognized that determining "whether there has been IAC often requires factual development in a collateral proceeding." *Id.* at 1246 (W. Fletcher, J., plurality).[6] Determining whether counsel's performance was deficient often requires asking the attorney to state the strategic or tactical reasons for his actions, and determining prejudice often requires discovery and an

---

[6] Although this conclusion was not "supported by a majority of the en banc panel," none of the other opinions discussed the issue of whether *Martinez* allowed factual development in a collateral proceeding when considering the underlying claim, so they did not express any opposition to the proposition stated by the plurality opinion. *See Clabourne v. Ryan*, 745 F.3d 362, 375 (9th Cir. 2014).

evidentiary hearing to assess the effect of the deficient performance. *Id.* at 1246–47. As the district court explained in denying the State's motion to stay,

> [I]t is simply illogical, and extraordinarily burdensome to the courts and the litigants, in a post-*Martinez* world, for a court to allow full evidentiary development and hearing on the *Martinez* "claim," but not allow consideration of that very same evidence as to the merits of the underlying trial-counsel IAC claim because his constitutionally ineffective PCR counsel failed to raise that claim.

*Jones v. Ryan*, 2018 WL 5066494, at *4.

While the Supreme Court held in *Cullen v. Pinholster* that a federal habeas court is ordinarily confined to the evidentiary record from state court, it held that the court was limited to "the record that was before the state court *that adjudicated the claim on the merits*." 563 U.S. 170, 180 (2011) (emphasis added). Because the underlying claim in a *Martinez* case has not been adjudicated on the merits in a state-court proceeding, "*Martinez* would be a dead letter if a prisoner's only opportunity to develop the factual record of his state PCR counsel's ineffectiveness had been in state PCR proceedings, where the same ineffective counsel represented him." *Detrich,* 740 F.3d at 1247. We have explained that "*Martinez* may provide a means to show 'cause' to overcome the default and reach the merits of the new claim." *Dickens v. Ryan*, 740 F.3d 1302, 1321 (9th Cir. 2014). The Supreme Court in *Martinez* recognized that "[c]laims of ineffective assistance at trial often require investigative work." 566 U.S. at 11.

Courts may require expanded records to reach the merits of these claims.

Other courts have reached the same conclusion as our four-judge plurality from *Detrich*. The Eighth Circuit held that *Martinez* provided an exception to § 2254(e)(2) in *Sasser v. Hobbs*, 735 F.3d 833, 853–54 (8th Cir. 2013). The Fifth Circuit has also noted that if the district court found cause and prejudice for the procedural default of any claim, "[i]t should then revisit the merits of any such claim anew," and its cause and prejudice findings "may directly address its merits determination of certain elements of that claim." *Barrientes v. Johnson*, 221 F.3d 741, 771, 771 n. 21 (5th Cir. 2000). *See also Woods v. Sinclair*, 764 F.3d 1109, 1138 (9th Cir. 2014) (citing the four-judge plurality from *Detrich* and remanding to the district court to determine whether defendant's IAC claims were substantial and whether PCR counsel was ineffective for failing to raise them, potentially with an evidentiary hearing and an opportunity to expand the record).

We conclude that 28 U.S.C. § 2254(e)(2) does not prevent a district court from considering new evidence, developed to overcome a procedural default under *Martinez v. Ryan*, when adjudicating the underlying claim on de novo review.

## B.  Merits of Ineffective Assistance Claims

In his habeas petition, Jones claimed that his Sixth Amendment right to effective assistance of counsel was violated by his trial counsel's failure to adequately investigate the police work, medical evidence, and timeline between Rachel's fatal injury and her death. *Jones Habeas*, 327 F. Supp. 3d at 1168. At trial, the State presented evidence that most of Rachel's injuries were inflicted on the afternoon of

May 1, and she was in Jones's sole care multiple times that afternoon. *Id.* at 1169, 1174–77.

As the district court correctly noted, *id*. at 1167, claims of ineffective assistance of counsel are governed by the principles set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To demonstrate prejudice under *Strickland*, Jones had to show that (1) counsel's performance was deficient so he "was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and (2) "the deficient performance prejudiced the defense" so that he was deprived of "a trial whose result is reliable." *Id*. at 687. As to the prejudice prong, *Strickland* requires a petitioner to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

The district court concluded that trial counsel acted unreasonably in failing to conduct a medical investigation into the timing of Rachel's injuries. *Jones Habeas*, 327 F. Supp. 3d at 1201. It found there was a reasonable probability that, absent counsel's failures, the jury would have had a reasonable doubt as to Jones's guilt. *Id.* at 1209. The State argues the district court erred by excusing Claim 1D's procedural default and granting relief under *Strickland*.[7]

---

[7] Like the parties, we will discuss Counts Four and Five separately because these depend on Jones's failure to obtain care for Rachel, rather than on any harm he personally caused.

1. Trial Evidence

Throughout the trial, the parties tried the case on the premise that Rachel sustained her injuries on the afternoon before her death. In opening statements, the prosecutor stated:

> [W]hat we will prove to you is that . . . Barry Jones was the only adult that had care of [Rachel] that day and thus the only adult that had the opportunity, in fact, was seen by neighborhood children abusing Rachel, that he is her rapist, and that he is her murderer.

Defense attorney Bruner similarly stated: "Everything in this case is going to center around what happened on Sunday, May 1st. Specifically, a couple of disputed hours . . . ." In Counts One through Three, Jones was charged with and found guilty of inflicting the specific injuries to Rachel's abdomen, scalp, and vagina. *See Jones Habeas*, 327 F. Supp. 3d at 1211–12. In Count Four, he was charged with intentionally or knowingly endangering Rachel by failing to take her to the hospital. *Id.* at 1212. The jury found that Jones committed Count One and Counts Two and Four knowingly and intentionally, so all three could serve as predicate felonies to support the felony murder conviction in Count Five. *Id.*

At trial, the State presented evidence from several witnesses to establish that most of Rachel's injuries—including bruising, her scalp injury, her vaginal injury, and the fatal bowel injury—were consistent with infliction between 2:00 p.m. and 5:30 p.m. on May 1, 1994. *Id.* at 1169. It presented medical testimony by Steven Siefert, an emergency room doctor at Kino Community Hospital;

Sergeant Sonia Pesquiera of the Pima County Sheriff's Department ("PCSD"), the lead investigator of Rachel's death; and Dr. John Howard, a forensic pathologist with the Pima County Medical Examiner's office. *Id.* Defense counsel did not present any evidence regarding the timeline. The defense, in fact, presented only one witness of its own, Jones's 11-year-old daughter Brandie. *Id.*

Dr. Siefert estimated that Rachel died between two or three hours before she arrived at the hospital at 6:16 a.m. on May 2, 1994. *Id.* at 1169–70. He and Dr. Howard both observed extensive bruising, including around the left side of her face and behind her ear, consistent with a slap or blow to the side of the head. *Id.* at 1170. Dr. Howard opined that many of the bruises and abrasions were inflicted approximately one day prior to death. *Id.* He explained that the number and multiple locations of injuries was consistent with Rachel having been beaten. *Id.* at 1171. Dr. Siefert also opined that Rachel's bruising would have begun to appear within a few hours of infliction, and assessed that 95 percent of her injuries occurred within 12 to 24 hours before her death. *Id.*

Rachel had an inch-long head laceration, above and behind her left ear, that went down to the skull bone. *Id.* Dr. Howard assessed that the injury was consistent with having been caused by a blunt force object with a relatively straight edge, like a pry bar found in Jones's van. *Id.* He opined that it was consistent with occurrence between 2:00 p.m. and 5:30 p.m. on May 1. *Id.*

Sergeant Pesquiera testified that she observed discoloration on the outside of Rachel's labia and pooled, bright red blood on the inside. *Id.* Dr. Howard determined

that she had blunt force injuries to her labia, bruising and scrapes, and a half-inch tear to her vagina. *Id.* He concluded that these genital injuries occurred about one day prior to her death, consistent with the time frame of "dozens" of her other injuries, and were consistent with penetration or attempted penetration. *Id.*

Dr. Howard determined that Rachel died of blunt abdominal trauma that caused a laceration of the small bowel. *Id.* He explained that she had sustained blunt force injury to her abdominal organs, causing a tear of the small bowel and bruising of the tissues around the small bowel, the wall of the large bowel, and connecting the intestine to the back of the abdominal wall. *Id.* at 1172. The rupture of her bowel required a force equivalent to a fall from more than two stories, an automobile accident at greater than 35 miles per hour, or a forceful directed blow to the abdomen. *Id.* This rupture caused peritonitis, inflammation and irritation of the lining of the abdominal tissues that causes death over a period of hours to days, or sometimes weeks. *Id.* He opined that the "injury is typical of having occurred about one day prior to death," in the same age range as the scalp, genital, and external injuries. *Id.* He opined that it could have occurred in the 24 hours prior to her death, possibly between 2:00 p.m. and 5:30 or 6:00 p.m. on May 1. *Id.* Defense counsel used Dr. Howard's testimony to argue that if the pry bar had been wielded by an adult, it would break ribs, fracture skulls, and do incredible damage to a small child, but he did not ask Dr. Howard any questions about the timing of any of Rachel's injuries. *Id.*

The State also presented testimony by Sergeant Pesquiera, Arizona Department of Public Safety Criminalist Edward Lukasik, and PCSD Detective Clark that blood consistent

with having come from Rachel was found in Jones's van and on blue jeans he wore at the time of his arrest. *Id.* Based on impression stains, the State argued that Rachel's head was bleeding as she lay in the back of the van because that was where she was sexually assaulted, beaten, and hit with the pry bar on the third trip away from the house. *Id.* at 1173. The State also argued based on the evidence of spatter stains found on the passenger seat, floor of the van, and Jones's shirt sleeve that after the assault, Jones put Rachel in the passenger seat and kept hitting her "trying to make her shut up." *Id.*

In support of its theory that Rachel was in Jones's sole care during the afternoon of Saturday, May 1, the State presented the testimony of Rachel's sister Becky; neighborhood children Ray and Laura, who claimed to see Jones hit Rachel; Jones's former girlfriend Joyce Richmond; and her adult son Terry. *Id.* at 1174–77.

Becky testified that there was a week when Rachel started "being scared" of Jones and would not go to him when he called her over. *Id.* at 1174. She testified that on the morning of Sunday, May 1, she, Rachel, and Jonathon got up early, watched cartoons, and ate lunch until Jones got up around 2:30 or 3:00 p.m., when a friend of his stopped by to see him. *Id.* Shortly after his friend left, Jones gave Becky and her brother permission to ride their bikes. *Id.* Becky then saw Jones leave his van on his first of three trips with Rachel that day, to go to the store for food, and he returned an hour and a half later. *Id.* Becky testified that Rachel was not sick or crying and seemed okay. *Id.* She testified that approximately fifteen to twenty minutes after Jones returned from the store, he left again for about thirty minutes, and Rachel seemed okay again when Becky saw her after this trip. *Id.* Becky

further testified that Jones later took Rachel to his brother's house, and they were back before Becky left for her friend's house around 5:00 or 6:00 p.m. *Id.* The State argued that Jones assaulted Rachel in the back of the van on this third trip. *Id.*

Becky testified that around 6:30 p.m., when she returned from her friend's house, she saw Rachel was on the couch, pale, bleeding from her head, vomiting, and with bruises on her face, hands, and fingers. *Id.* That was also the first time Becky saw her mother awake that day. *Id.* Jones left for a time, and when he returned, Angela took Rachel outside where Angela and Jones had an argument. *Id.*

Norma Lopez testified that on May 1, she sent her eight-year-old twins Ray and Laura to the Choice Market on Benson Highway at 3:00 p.m. or 4:00 p.m. *Id.* at 1175. When they returned, Ray told Norma he saw a yellow van with a man inside hitting a little girl. *Id.* The next day Norma heard on the news that a man had been arrested in relation to the death of a little girl, and her children identified that person as the man they had seen in the van. *Id.* She later called 911 to report the twins' identification. *Id.* Ray and Laura also testified at Jones's trial that they had seen a man hitting a little girl while driving, although Ray acknowledged that he could not see the driver's face and Laura admitted she could just see "a little bit" through the front window of the van. *Id.* at 1175–76.

Joyce Richmond, Jones's former girlfriend, testified that she returned Brandie to Jones's trailer sometime between 7:00 p.m. and 8:00 p.m. on May 1. *Id.* at 1176. Richmond saw Rachel on the couch with a bleeding head, but without bruises on her face or hands. *Id.* She was accompanied at Jones's

trailer by her adult son Terry, who testified that he questioned Jones about Rachel's bleeding head. *Id.* He testified that Jones told him he had taken Rachel to the fire department. *Id.*

Becky testified that she woke up early in the morning on May 2, found Rachel in the bedroom doorway, and put her back in bed. *Id.* at 1177. She next woke to her mother yelling, and Jones then took Angela and Rachel to the hospital. *Id.* Jones returned and took Becky and Brandie to a neighboring camp, where law enforcement located Jones and transported him to the Sheriff's Department at 8:00 a.m. on May 2. *Id.* On the way there, Jones was upset, said there was something wrong with his little girl, and asked if they would take him to see her. *Id.*

Jones's only witness, his daughter Brandie, testified that she saw a six-year-old boy hit Rachel in the stomach with a metal bar on April 30. *Jones v. Schriro,* 2008 WL 4446619, at *8. The State pointed out numerous inconsistencies between her testimony at trial, interviews she gave to law enforcement, and her testimony at deposition; Brandie also admitted lying to detectives and defense counsel. *Jones Habeas*, 327 F. Supp. 3d at 1177.

### 2.  *Martinez* Hearing

At the *Martinez* evidentiary hearing, the court heard testimony from defense trial counsel Sean Bruner and Leslie Bowman; defense PCR counsel James Hazel; lead investigative detective Sergeant Sonia Pesquiera; forensic pathologists Dr. Philip Keen, Dr. Janice Ophoven, and Dr. John Howard; emergency medicine and trauma specialist Dr. Mary Pat McKay; biomechanics and functional human anatomy expert Dr. Patrick Hannon; and crime scene and

bloodstain pattern analyst Stuart James, among others. *Id.* at 1178. The court found that the evidence presented during those proceedings about which trial and PCR counsel were aware or should have been aware would have suggested the need for counsel to conduct further investigation into the medical timeline, blood evidence, and eyewitness testimony. *Id.* As discussed further below, the evidence suggested the bruises could not be reliably dated and might have resulted from natural or accidental processes; the scalp, vaginal, and fatal injuries were likely at least two days old; and the bloodstains were not typical of those produced during a beating.

On July 14, 1994, on defense counsel's motion, the trial judge authorized up to $1,000 for a defense expert to review Rachel's autopsy report or to conduct a second autopsy. *Id.* at 1180. On July 20, 1994, Bowman sent forensic pathologist Dr. Keen a letter acknowledging Dr. Keen's agreement to review Rachel's autopsy report, and posing several questions for Dr. Keen to consider when reviewing the report, including whether Rachel's injuries could be dated and the amount of force necessary to inflict them. *Id.* Bowman confirmed in the letter that Dr. Keen had explained that his review of the autopsy "may involve obtaining access to photographs, slides and other physical evidence" and such access could "be arranged as necessary." *Id.*

At the *Martinez* hearing, Bowman acknowledged that it would have been reasonable to anticipate that the State would present medical evidence dating Rachel's injuries to the afternoon of May 1, and Bruner testified that he did expect that at some point the State would present medical evidence tying Rachel's injuries to those couple of disputed hours. *Jones Habeas*, 327 F. Supp. 3d at 1199. Dr. Keen testified

that he "would not have speculated about the time of injury" without receiving the tissue slides. He explained that he had no recollection of ever reviewing any photographs, slides, or other physical evidence, and there is no record that he had ever received such evidence. *Jones Habeas*, 327 F. Supp. 3d at 1180. Bowman also testified that she knew that an examination of the tissue slides was necessary in order to date Rachel's injuries, and that it was possible that she and Bruner "dropped the ball and didn't follow up properly."

About a month later, on August 18, 1994, defense counsel and Dr. Keen spoke by phone, but neither can recall what was discussed during that call. *Id.* Four days later, on August 22, 1994, Rachel's body was released for burial with the consent of defense counsel and without a second autopsy. *Id.* Dr. Keen did not testify at Jones's trial. *Id.*

We must consider whether there was evidence presented at the *Martinez* hearing but not at trial that might have created reasonable doubt. *See Daniels v. Woodford*, 428 F.3d 1181, 1201 (9th Cir. 2005) (comparing "the evidence that actually was presented to the jury with that which could have been presented had counsel acted appropriately").

Sergeant Pesquiera decided early in the investigation that Rachel's injuries occurred on Sunday, May 1, even though she never asked Dr. Howard to share his findings on the timing of the injuries. *Jones Habeas*, 327 F. Supp. 3d at 1178. In his pretrial interview and during Angela's trial, Dr. Howard suggested a larger window of time during which Rachel's injuries might have been inflicted, including potentially April 30. *Id.* at 1179. Sergeant Pesquiera did not document inquiry to any medical professional about the timing of Rachel's injuries, and she agreed at the evidentiary

hearing that if she had more precise medical information that showed the injuries could have happened several days earlier, as Dr. Howard's 2004 declaration suggested, she would have expanded her investigation. *Id.* at 1178–79.

During his pretrial interview, Dr. Howard stated there were no tests available to determine the exact age of bruises, but he could provide approximations. *Id.* at 1179. Dr. Ophoven explained that interpreting the age of bruises from physical appearance and color was recognized by the forensic community to be very inaccurate and should not be done. *Id.* at 1193. Dr. Howard agreed that he would have told the attorneys that you cannot really distinguish or date bruises to a specific day had the attorneys asked him about that at Jones's trial. *Id.*

Dr. Ophoven testified that some of the marks on Rachel's body, along with wounds that were actively bleeding, could have been caused by metabolic changes at the cellular level from the body not getting enough oxygen and glucose. *Id.* She further stated that it was possible many of the bruises observed on Rachel's body at the time of her death could have been caused by falls or other injuries sustained while Rachel attempted to walk or otherwise move around during the final stages of sepsis and peritonitis. *Id.* at 1194.

During his pretrial interview, Dr. Howard stated the injury to Rachel's scalp was "[p]robably two days old," and he elsewhere made reference to the scalp injury as being 72 hours or older. *Id.* at 1179. Dr. Ophoven reviewed gross photographs of the scalp injury and believed they were consistent with Dr. Howard's opinion in his pretrial interview. *Id.* at 1194. Both Dr. Hannon and Dr. Ophoven concluded that the pry bar found in the van did not cause

Rachel's scalp injury or the fatal injury to her bowel, and both agreed it was possible the injury could have been inflicted by another child. *Id.*

In his pretrial interview, Dr. Howard stated that the vaginal injury most likely occurred one or two days before death. *Id.* at 1179. At Angela's trial, Dr. Howard testified that the minimal age of the vaginal injury was 12 hours prior to death, but was more typical of around 24 hours. *Id.*

Dr. Ophoven conducted a microscopic examination of the physical evidence of Rachel's vaginal injury obtained during autopsy and concluded that Rachel had a vaginal injury that was weeks old, and possibly predated the time period in which Rachel lived with Jones. *Id.* at 1192. Dr. Keen also reviewed the photo micrographs of Rachel's vaginal injury and identified connective tissue indicating that the vaginal injury was multiple days, possibly weeks, old, and was older than the abdominal injury. *Id.* Both Dr. Ophoven and Dr. Keen agreed that the evidence of fresher blood in Rachel's vaginal area indicated a newer injury in combination with an older injury, but this did not necessarily indicate recent intentional sexual trauma as opposed to irritation of an older injury, poor hygiene, itching or scratching, or reopening of an older wound during the death process. *Id.* On cross-examination, Dr. Howard admitted that his testimony at Jones's trial could have left the jury with the misimpression that the vaginal injury was most consistent with infliction between 2:00 and 5:00 on the afternoon of Sunday, May 1, while his findings were that the injury was most consistent with infliction on Saturday, April 30. *Id.* at 1193.

During his pretrial interview, Dr. Howard was not asked if he could date the small bowel injury, but he did say it could

take hours to a day to develop severe symptoms of the associated peritonitis, and then an unspecific number of hours after that to die. *Id.* at 1179. At Angela's trial, he testified that the internal injury was "most consistent" with 24 hours prior to death. *Id.*

At the *Martinez* hearing, both Dr. Ophoven and Dr. McKay concluded that the injury to Rachel's small bowel occurred at least 48 hours (and probably many more hours) before her death. *Id.* at 1190. Dr. Ophoven arrived at this conclusion based on her review of the autopsy records and supporting documentation, including photographs and tissue slides taken during Rachel's autopsy. *Id.* Dr. McKay testified regarding her personal experience treating duodenal injuries like Rachel's as well as an extensive literature review she undertook focused on pediatric injuries involving duodenal rupture, perforation, laceration, treatment and outcomes. *Id.* at 1191. In her study of more than 200 cases of intestinal injury in children over many decades, including at least 160 cases of duodenal perforation describing the injury timeline from diagnosis, she did not find a single reported case in which a duodenal injury resulted in death within 48 hours after the known time of injury. *Id.* Dr. Ophoven and Dr. McKay agreed that there was nothing in Rachel's medical records that would suggest that her inflammatory response to the injury would deviate from the standard case. *Id.* Dr. Howard explained that if he had been asked the right questions at Jones's trial, he would have testified truthfully that in his judgment the injury was most consistent with having occurred prior to May 1, but he admitted that he did not make this finding clear to Jones's jury. *Id.* at 1192.

Using bloodstain analysis principles that were available in 1994, blood pattern analyst Stuart James testified that the

bloodstains he observed in the van were consistent with Rachel being carried or moved within the van while she was bleeding from an open wound. *Id.* at 1195. He concluded that the bloodstains were not typical of those produced during a beating because there was only a single laceration on Rachel's head, which often just produces blood flow and not impact splatter. *Id.* He further explained that the traces of blood on Jones's May 2 clothing indicated contact and proximity to a source of wet blood but were insufficient to conclude anything about whether a beating took place in the van. *Id.* James testified that these stains could have occurred as the result of lifting or otherwise attending to Rachel while she was bleeding. *Id.*

### 3.  Counts One, Two, and Three

The district court concluded that the convictions of Jones on Counts One, Two, and Three all depended on the premise that Jones physically and sexually assaulted Rachel on May 1, when she was in his custody, and there was a reasonable probability that the jury would have had a reasonable doubt about that conclusion had defense counsel performed adequately to challenge the premise that the injuries were inflicted at that time. *Id.* at 1212.

#### a.  Deficient Performance

Although the court defers to a lawyer's strategic trial choices, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. The State argues the district court departed from *Strickland*'s presumption of reasonableness and effectively presumed that counsel behaved unreasonably.

In particular, the State argues that defense counsel acted reasonably by consulting with independent medical pathologist Dr. Philip Keen before trial, specifically inquiring about the timing of Rachel's injuries. Because neither Dr. Keen nor Jones's attorneys could recall the content of the conversation between Dr. Keen and counsel or the reason Dr. Keen was not involved further in the case, the State contends that the court should have presumed counsel acted reasonably and strategically. The State argues the court's factual finding that counsel abandoned the medical investigation based on "inattention and neglect, not reasoned strategic judgment" was clearly erroneous because no affirmative evidence established that counsel abandoned their medical investigation for negligent or inattentive reasons.

We agree that the "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. The State correctly notes that neither Dr. Keen nor counsel could recall the content of their phone conversation, which might otherwise shed light on exactly why no further consultation occurred.

The State does not dispute, however, that both Bruner and Bowman acknowledged that it would have been reasonable to anticipate that the State would present medical evidence dating Rachel's injuries to the afternoon of May 1. *Jones Habeas*, 327 F. Supp. 3d at 1199. The district court concluded defense counsel acted unreasonably in failing to conduct their own investigation on the dating of the injuries and in failing to challenge any of the State's evidence that suggested all of Rachel's injuries were consistent with being inflicted on the afternoon of May 1, when Rachel was alone with Jones in his van. *Id.* at 1200. Defense counsel also never challenged the

critical injury timeline evidence, failing to impeach
Dr. Howard with his earlier statements and testimony finding
Rachel's injuries "most consistent" with infliction prior to
May 1. *Id.* at 1206. Bruner admitted his failure was due to
inattention. *Id.*

In her prior letter to Dr. Keen, Bowman acknowledged
that he had explained that his review of the autopsy "may
involve obtaining access to photographs, slides and other
physical evidence." *Id.* at 1180. Bowman also testified that
she knew that an examination of the tissue slides was
necessary in order to date Rachel's injuries, and that it was
possible that she and Bruner "dropped the ball and didn't
follow up properly." The State on appeal concedes that
Dr. Keen did not receive those slides. We conclude that the
district court did not clearly err by finding that "[c]ounsel
knew the slides were needed to make a reliable timeline
assessment but failed to ensure they were provided to
Dr. Keen." *Jones Habeas*, 327 F. Supp. 3d at 1202.

Counsel also knew before trial that there was going to be
evidence presented with respect to the interpretation of blood
evidence, but failed to consult with any bloodstain
interpretation expert. *Id.* at 1203. Becky reported that Jones
and Angela did CPR on Rachel, then rushed her to the
hospital, so there was reason to believe that the trace amounts
of blood on Jones's clothing might have been transferred
from Rachel's bleeding head while Jones attempted to
administer aid or transport Rachel to the hospital. *Id.* The
State does not challenge the district court's conclusion that

trial counsel's failure to investigate the blood evidence was objectively unreasonable. *See id.* at 1203.**[8]**

The State also argues reasonable counsel could have elected not to present medical testimony on any count because that testimony would have shown Jones's guilt on Count Four and, by extension, Count Five, the most serious charge. Dr. Keen and Dr. Ophoven both conceded that Rachel may have suffered a new vaginal injury shortly before her death, which may have been damaging to Jones on Count One, the sexual assault charge, which was also a predicate for the felony murder charge in Count Five. The State does not dispute that counsel did not obtain an opinion from Dr. Keen or any other expert regarding the injury timeline, however, so counsel's decision could not have been made based on the asserted "double-edged" and "imprecise[e]" nature of an expert's opinion. We agree with Jones that trial counsel cannot reasonably choose not to present evidence without undertaking the underlying investigation that would undercover the evidence.

   b.   Prejudice

The State argues Jones has not shown a reasonable probability of a different result given the medical evidence's imprecision and the strong circumstantial evidence of his guilt. It points to testimony by Becky that Rachel was eating

---

**[8]** The district court ultimately concluded that the presentation at trial by the defense of a bloodstain expert would not have, by itself, established a reasonable probability of a different verdict. In combination with the evidence discussed above regarding the timing of the injuries, however, the district court concluded that the potential impact of a bloodstain expert strengthened its finding that Jones suffered prejudice from counsel's deficient performance. *Id.* at 1210.

and behaving normally on April 30 and the morning of May 1; by two neighborhood children that they saw Jones striking Rachel in the afternoon on May 1; by a neighbor that she saw Rachel markedly ill in the late afternoon, after she had returned from her excursion alone with Jones; and by Richmond, her son, and Becky that Rachel's health declined in the late evening.

At trial, the State presented substantial evidence that all of Rachel's injuries were consistent with infliction on the afternoon of Sunday, May 1, when she was alone with Jones in his van. Defense trial counsel could have questioned this evidence or presented its own investigative findings to cast doubt on this timeline but failed to do so. *Jones Habeas*, 327 F. Supp. 3d at 1206.

At trial, Dr. Howard testified that the abdominal injury occurred as few as twelve hours prior to death. *Id.* at 1171. Drs. Ophoven and Keen both estimated that her abdominal injury occurred two or more days prior to her death. *Id.* at 1190. At Angela Gray's trial, Dr. Howard indicated that the internal injuries occurred about 24 hours prior to her death. *Id.* at 1179. He also agreed that if asked the right questions by defense counsel at Jones's trial, he would have testified truthfully that the injury was most consistent with having occurred prior to May 1. *Id.* at 1192.

Dr. Howard also testified at Jones's trial that Rachel's scalp injury was consistent with having been inflicted between the hours of 2:00 p.m. and 5:30 p.m. the day prior to her death, and her vaginal injury occurred on a time frame consistent with all her other injuries. *Id.* at 1171. In his pretrial interview, Dr. Howard dated the scalp injury as probably two days old. *Id.* at 1179. Dr. Ophoven provided the

same earlier time frame for the scalp injury. *Id.* at 1194. Dr. Keen estimated that the vaginal injury was older than the abdominal injury. *Id.* at 1192. Dr. Ophoven estimated that it began weeks prior and possibly predated when Jones began living with Rachel and her family. *Id.* at 1192. Dr. Howard also testified at the *Martinez* hearing that the injury was most consistent with infliction on Saturday, April 30. *Id.* at 1193.

We agree with the district court that the evidence presented at the *Martinez* hearings "undermines considerably the confidence in the outcome of the trial court proceedings." *Jones Habeas*, 327 F. Supp. 3d at 1206.

4. Count Four

Counts One to Three charged Jones with inflicting affirmative injury to Rachel by sexual assault, causing Rachel's abdominal injury, and lacerating her scalp and bruising her, respectively. In contrast, the charge against Jones in Count Four was instead based on his failure to take Rachel to the hospital after she was injured. Specifically, Count Four charged Jones with child abuse under circumstances likely to cause death or serious physical injury, in violation of A.R.S. § 13-3623(B). The jury instructions required proof that:

> 1. The defendant acted under circumstances likely to cause death or serious physical injury; and 2. The defendant caused physical injury to a child, or, having custody or care of a child, the defendant allowed the health of the child to be endangered; and 3. The defendant acted with one of the following mental states: (A) intentionally or knowingly,

(B) recklessly, or (C) with criminal negligence.

The third element of the crime, involving the defendant's mental state, distinguishes between different forms of the crime. Violation of section 13-3623 is a class 2 felony "[i]f done intentionally or knowingly," a class 3 felony "[i]f done recklessly," and a class 4 felony "[i]f done with criminal negligence." A.R.S. §§ 13-3623(B). The jury instructions explained that the jury was permitted to find the defendant guilty of the less serious crimes of child abuse committed recklessly or with criminal negligence (as opposed to intentionally or knowingly). In addition, the trial court correctly instructed the jurors that Counts Two and Four could only be considered predicate felonies for felony murder if they were committed intentionally or knowingly, under circumstances likely to produce death or serious injury. *Jones Habeas*, 327. F. Supp. 3d at 1163–64. A finding that Jones had acted recklessly or with criminal negligence in failing to obtain medical assistance for Rachel would not support a conviction for felony murder.

The jurors returned a guilty verdict, finding that Jones committed the crime intentionally or knowingly. *Id.* at 1164. At sentencing, the court described Count Four as "a dangerous crime against children in the first degree with two prior predicate felony convictions" and "a class two felony." It then sentenced Jones to life imprisonment, his longest term-of-years sentence.

The district court found there was a reasonable probability that the jury would not have found that Jones acted with a knowing or intentional state in Count Four if the defense put on evidence questioning the medical timeline and suggesting

he was not the actual perpetrator of the assault. *Id.* at 1213–14.

### a.   Deficient Performance

The State argues counsel reasonably attempted to challenge Count Four only on the ground that Jones lacked care or custody of Rachel because the Arizona Supreme Court did not pronounce the legal standard on that issue until his case. *See Jones State*, 937 P.2d at 314–16. Although it may have been reasonable for counsel to challenge Count Four on the ground that Jones lacked care or custody, that defense was not incompatible with a defense based on the injury timeline. Defense counsel could have made both arguments. The fact that counsel brought a separate, non-antagonistic defense should not affect the relevant *Strickland* inquiry of whether counsel's performance was deficient and prejudicial in failing to adequately investigate the medical evidence and medical timeline of Rachel's injuries. *See Jones Habeas*, 327 F. Supp. 3d at 1212 n.17.

The State also argues the medical testimony Jones presented at his habeas proceeding was double-edged, so reasonable counsel could have elected to omit it, precluding a finding of deficient performance. As noted above, however, counsel's decision could not have been made based on the doubled-edged nature of experts' opinions because counsel did not obtain an expert's opinion on the injury timeline. Counsel could not have decided not to present evidence because it was double-edged if he was never aware of that evidence in the first place.

b.  Prejudice

To prove Jones acted knowingly, the State had to prove he was "aware or believe[d]" Rachel's health was endangered and she needed medical treatment. A.R.S. 13-105(9)(a)–(b).

The State argues Jones's expert witnesses at the *Martinez* hearing conceded facts sufficient to prove Jones's guilt. It argues Count Four is "established if Jones intentionally or knowingly *permitted Rachel's health to be endangered*," so it does not matter whether he lacked knowledge of the extent of Rachel's injuries. (emphasis in original). In support of this proposition, it cites to *State v. Payne*, 314 P.3d 1239 (Ariz. 2013); *State v. Mahaney*, 975 P.2d 156 (Ariz. App. 1999); and *Varela v. Ryan*, No. CV-15-1971-PHX-JJT (JFM), 2016 WL 8252819 (D. Ariz. Nov. 15, 2016). The State argues the evidence, including concessions by Drs. Ophoven and McKay, establish that Jones was aware Rachel's condition was declining and her health was endangered, yet he did nothing to help her.

As the State itself acknowledges, though, state law requires evidence that Jones intentionally or knowingly permitted that Rachel's health be *endangered*. A.R.S. § 13-105(9)(a)–(b). The Arizona Court of Appeals has defined this term as "expose to potential harm," which "requires more than the ordinary danger to which children are exposed on a daily basis." *Mahaney*, 975 P.2d at 159, 159 n.4. While the Arizona Supreme Court has affirmed that the trial court need not allow the defendant to argue that the State must prove the child was abused under circumstances that the defendant intended or knew were likely to cause death or serious physical injury, it did so because "the mens rea refers to the act that the defendant 'does.'" *Payne*, 314 P.3d at 1260–61.

An Arizona district court has also concluded that "the danger must result from the defendant's actions; pre-existing danger from someone else's actions does not suffice." *Varela*, 2016 WL 8252819, at *13. We agree with the district court in this case that "[i]f Petitioner was not the perpetrator, if he did not cause the injuries, there was little evidence presented at trial that would suggest he was put on notice of the severity of the injuries, and thus could form the requisite intentional and knowing mental state." *Jones Habeas*, 327 F. Supp. 3d at 1213.

At the habeas hearing, Dr. Ophoven described the likely symptoms of Rachel's cause of death, a ruptured duodenum with dehydration, shock, and eventually peritonitis. She described how "they wouldn't feel good, but they would not necessarily look like they were suffering from an impending catastrophe." She described cases of children, as well as adults, not appearing to need medical attention "until there's actually a catastrophic decompensation like happened in this case," which could be "as short as two or three hours." She described how in children, "the period before irreversible shock can be very short," so until that moment, "you may or may not appreciate that a catastrophic event is about to take place." She also testified that the symptoms of small intestine injury could be missed, as the symptoms frequently are not interpreted as serious until the catastrophe manifests itself.

Dr. McKay testified that the symptoms of discomfort and pain would vary by person. She explained that children in the victim's age group might not have the ability to explain that the symptoms were different or worse than normal stomach ache. She also testified that in her personal experience, she had seen delay in severe symptoms and in diagnosis of duodenal injuries.

Dr. Ophoven and Dr. McKay both testified that the seriousness of an injury like Rachel's could readily be missed until the final stages. At the hearing on November 1, 2017, Dr. Ophoven testified that there could be a significant delay of symptoms that looked really bad from duodenum injury. We conclude that there is a reasonable probability that the jury would not have found that Jones intentionally or knowingly exposed Rachel to "more than the ordinary danger to which children are exposed on a daily basis." *See Mahaney*, 975 P.2d at 159 n.4.

Furthermore, both Jones and Rachel's mother Angela had care or custody of Rachel in the hours leading up to her death. Angela was charged with and convicted of endangering Rachel by failing to obtain medical assistance in Count Four, but she was found by the jury in her trial to have acted only recklessly, not intentionally or knowingly. We note that Angela told police that she and Jones discussed taking Rachel to the hospital on the night of May 1, but she was "scared" that if she did so "they might take her away" because of the cut on her head and the bruises on her stomach. *Jones Habeas*, 327 F. Supp. 3d at 1184. Nonetheless, her jury determined she had acted only "recklessly." *Id.* at 1163. As a result, she was only convicted of the lesser included class 3 felony, for which she was sentenced to a term of 8.75 years.

We conclude that it was reasonably probable that a similar verdict would have been reached on Count Four for Jones, if the defense had presented evidence that Rachel's injuries had been inflicted earlier in time, meaning before the State had established that Rachel was in Jones's sole custody. Although the jury could reasonably have convicted Jones of intentional or knowing action even including the evidence counsel should have presented, we conclude that Jones has

shown "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See Strickland*, 466 U.S. at 694.

We acknowledge that this is a close question. There was ample evidence that could have supported a verdict that Jones's action in failing to obtain medical assistance was intentional or at least knowing. Dr. Ophoven acknowledged that she was "not backing down from [her] opinion that a caretaker of the child should have known that she needed immediate medical attention." She had previously stated her opinion that in the hours before Rachel, Angela, and Jones went to bed, "it would have been evident to anyone with Rachel that she was in need of immediate medical attention," so "the decision to withhold medical care is consistent with fatal neglect."

The night before her death, multiple people noticed Rachel's condition and pointed it out to Jones. Joyce Richmond reported that she was at Jones's trailer the night of May 1, and Rachel was lying quietly on a pillow with her head bleeding. *Jones Habeas*, 327 F. Supp. 3d at 1184. Jones and Angela told her that some kids had pushed Rachel out of the van. *Id.* Shortly after his arrest, Jones himself told police that he and Angela were up with Rachel much of Sunday night, and Rachel would throw up anytime she drank anything. *Id.* at 1183.

Jones also told multiple individuals that he had taken Rachel to get medical attention. Angela told police during questioning that Jones told her he had taken Rachel to the fire station where they rinsed her head out and informed him she was not in need of stitches. *Id.* at 1184. Joyce Richmond told police that Jones told her he had taken Rachel to the fire

station, and they said she would be all right. *Id.* Terry
Richmond testified that he questioned Jones about Rachel's
bleeding head, and Jones told him he had taken Rachel to the
fire department. *Id.* at 1176. When he was interviewed by
police shortly after he was arrested, Jones stated that he did
not take Rachel to the Rural Metro Fire Department, as he
had told Angela and others, because he saw a police vehicle
there and did not have a driver's license. *Id.* at 1183. He told
police that he did encounter an EMT at the Quik-Mart who
looked at the cut, shined a light in the eyes, and advised Jones
to "keep the ice pack on it and it'll be okay." *Id.* The captain
of the Rural Metro Fire Department testified that all
emergency encounters were logged, but there were no records
of Jones or Rachel in the call log. *Id.* at 1176.

All of that evidence could support a factual finding by the
jury that the failure of Jones to seek medical assistance for
Rachel was deliberate because he did not want to call
attention to his own misconduct. That result was not certain,
however. Most of this evidence applied to support the case
against Angela, as well. She was Rachel's mother, likely to
have been held most responsible for observing her daughter's
condition, but the jury in her trial declined to find that she had
acted intentionally or knowingly. It appears to us, as it did to
the district court, that there was a reasonable probability that,
if presented with evidence that Rachel's injuries had not been
inflicted when she was in Jones's sole custody, the jury in
Jones's case would similarly have had a reasonable doubt on
the question of whether Jones's failure to obtain medical care
for her was the result of intentional or knowing misconduct
instead of recklessness.

Jones also challenges his conviction on Count Four by
arguing that the State was required to show that the delay in

seeking treatment created or increased a likelihood of death or seriously physical injury. He argues Dr. Ophoven and Dr. McKay each cast doubt on whether any actions by Jones after Rachel appeared ill would have had any impact. *Id.* As a result, he contends that he could not be convicted on Count Four under any mental state, including recklessness, because Rachel would have died anyway.

Dr. Ophoven testified that once a person entered irreversible shock, the system of blood circulation had broken down and the person could not be recovered even in the hospital. However, on cross-examination, she clarified that if Rachel had gone to the doctor before irreversible shock set in, this would have been a potentially survivable injury. She later confirmed that these injuries were "very treatable." Jones's experts at the *Martinez* hearings also agree that his "failure to take Rachel to the hospital either caused or contributed to her death." *See Jones Habeas*, 327 F. Supp. 3d at 1213. The evidence does not support the argument that nothing that Jones did or did not do would have mattered. We also agree with the district court that "there is evidence that Petitioner was concerned about getting Rachel care because he would be perceived as the perpetrator of child abuse," so he has not demonstrated that he lacked any criminal mental state. *Id.*

### c. Remedy

Sixth Amendment remedies should be "tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests." *United States v. Morrison*, 449 U.S. 361, 364 (1981). "Thus, a remedy must 'neutralize the taint' of a constitutional violation, while at the same time not grant a windfall to the defendant or needlessly squander the considerable resources

the State properly invested in the criminal prosecution." *Lafler v. Cooper*, 566 U.S. 156, 170 (2012) (citations omitted).

With respect to Count Four, this is not a situation where "resentencing alone will not be full redress for the constitutional injury." *See Johnson v. Uribe*, 700 F.3d 413, 426 (9th Cir. 2012) (quoting *Lafler*, 566 U.S. at 171). Jones has demonstrated prejudice as to his specific offense of conviction but not as to his overall guilt on Count Four. He has not established a reasonable probability that he would not have been convicted at all on that charge, particularly of the lesser included offense of having acted recklessly in failing to assist Rachel. The district court also concluded that "Petitioner's own experts in these proceedings do agree that Petitioner's failure to take Rachel to the hospital either caused or contributed to her death" but concluded that their testimony did not "show that Petitioner had the requisite mental state of 'intentionally and knowingly' to support a conviction of the class 2 felony child abuse charge, a felony murder predicate, as opposed to a lesser charge of the class 3 felony, recklessly, or class 4 felony, negligently." *Jones Habeas*, 327 F. Supp. 3d at 1213. Our own de novo review leads us to conclude that a conviction on Count Four for reckless conduct was a reasonable possibility, but that a complete acquittal on Count Four or a conviction for the lesser crime of having acted with criminal negligence were not reasonable possibilities. We therefore conclude that "a new trial would [not] be tailored to such constitutional violations and would improperly grant [Jones] a windfall." *See Loher v. Thomas*, 825 F.3d 1103, 1122 (9th Cir. 2016). The appropriate remedy for this error is resentencing based on the lesser included offense, for reckless rather than intentional or knowing conduct. Alternatively, because the

evidence could have supported a conviction on Count Four based on intentional or knowing misconduct by Jones, the State may elect to retry him on that charge.

### 5.  Count Five

Count Five charged Jones with felony murder for either sexual assault of a minor under fifteen (Count One) or child abuse committed intentionally or knowingly under circumstances likely to cause death or serious physical injury (Counts Two and Four). *Jones Habeas*, 327 F. Supp. 3d at 1212. The jury found Jones guilty of Count Five after finding that he had committed Counts Two and Four under circumstances likely to produce death or serious physical injury with a knowing or intentional mental state. *Id.* The habeas court concluded that Jones had demonstrated prejudice with respect to the capital charge because there was a reasonable probability that the jury would not have convicted Jones of any of the predicate felonies. *Id.* at 1214.

As discussed above, the State argues that Jones failed to prove deficient performance or prejudice on Count Five largely because the evidence at the *Martinez* hearing did not call into question his guilt on Count Four, and by extension Count Five. Because we conclude Jones has demonstrated deficient performance and prejudice with respect to Counts One, Two, and Four, he has also demonstrated ineffective assistance on Count Five.

## IV.    Conclusion

We hold that the district court properly considered evidence adduced at the *Martinez* hearing to determine whether Jones's IAC claim was excused from procedural

default when determining the merits of Jones's underlying IAC claim even though this evidence was not before the state court. Jones has demonstrated that counsel rendered deficient performance in failing to adequately investigate whether Rachel's injuries were sustained during the time she was alone with Jones, and that he was prejudiced by these failures. As to Count Four, however, this failure only affected the jury's determination that Jones had acted intentionally or knowingly, but not his underlying guilt on the lesser included offense of reckless misconduct. Accordingly, we affirm the district court's grant of Jones's habeas petition but vacate in part the district court's remedy. The district court is directed to amend its order accordingly. The State may elect to seek resentencing on Count Four or to retry him for the more serious version for that offense. Otherwise, the district court's order that the State release Jones from custody unless it initiates new trial proceedings is affirmed.

**AFFIRMED IN PART; VACATED IN PART; REMANDED.**