**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

ZANE DICKINSON,
                *Petitioner-Appellant*,

v.

DAVID SHINN, Director; ATTORNEY
GENERAL FOR THE STATE OF
ARIZONA,
                *Respondents-Appellees*.

No. 20-15175

D.C. No.
3:18-cv-08037-
MTL

OPINION

Appeal from the United States District Court
for the District of Arizona
Michael T. Liburdi, District Judge, Presiding

Argued and Submitted November 19, 2020
Phoenix, Arizona

Filed June 22, 2021

Before: Richard C. Tallman, Jay S. Bybee, and
Bridget S. Bade, Circuit Judges.

Opinion by Judge Bade

## SUMMARY[*]

### Habeas Corpus

The panel affirmed the district court's denial of Zane Dickinson's habeas corpus petition challenging his Arizona state court conviction for attempted second-degree murder in a case in which the trial court misstated Arizona law in its instructions to the jury by implying that a defendant could be guilty of attempted second-degree murder if he merely intended to cause serious physical injury, not death.

Trial counsel failed to object to the erroneous instruction. With different counsel, Dickinson unsuccessfully challenged the error on direct appeal. He petitioned for state post-conviction relief, but his counsel did not raise any claims related to the instructional error, and the state trial and appellate courts denied relief. The district court denied Dickinson's federal habeas corpus petition, declining to excuse Dickinson's procedural default of these claims.

In this appeal, Dickinson asked this court to excuse his procedural default under *Martinez v. Ryan*, 566 U.S. 1 (2012), so that he could seek habeas relief on the basis of constitutionally ineffective assistance of trial counsel (IATC).

Dickinson asserted two theories in an effort to establish prejudice and excuse the procedural default.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

He argued that his trial counsel's failure to object prejudiced him because it deprived him of a more favorable standard of review on direct appeal. Rejecting this theory on a different ground than the district court did, the panel held that as a matter of federal law, Dickinson cannot satisfy *Strickland*'s prejudice requirement for his IATC claim merely by showing that trial counsel's failure to object to a jury instruction deprived him of a more favorable standard of review on direct appeal.

Dickinson also argued that his IATC claim is substantial because his trial counsel's failure to object to the erroneous instruction prejudiced him at trial. The panel noted that the record amply supports the Arizona Court of Appeals' characterization of the trial, and held that Dickinson cannot demonstrate a reasonable probability that the trial would have had a different outcome without the erroneous instruction, where the jury heard overwhelming evidence that Dickinson intended to kill the victim, it heard only a few passing comments that it could have conceivably construed as evidence that Dickinson did not intend to kill the victim, and neither the State nor defense counsel ever suggested that Dickinson intended only to cause serious physical injury.

**COUNSEL**

Molly A. Karlin (argued), Assistant Federal Public Defender; Jon M. Sands, Federal Public Defender; Office of the Federal Public Defender, Phoenix, Arizona; for Petitioner-Appellant.

Jillian B. Francis (argued) and Jason D. Lewis, Assistant Attorneys General; J.D. Nielsen, Habeas Unit Chief; Mark

Brnovich, Attorney General; Office of the Attorney General, Phoenix, Arizona; for Respondents-Appellees.

## OPINION

BADE, Circuit Judge:

During Zane Dickinson's trial for attempted second-degree murder, the court misstated Arizona law in its instructions to the jury, and his trial counsel failed to object to the erroneous instruction. With different counsel, Dickinson challenged the error on direct appeal; the Arizona Court of Appeals affirmed his conviction and the Arizona Supreme Court denied review. Dickinson petitioned for state post-conviction relief, but his counsel did not raise any claims related to the instructional error. After the state trial and appellate courts denied relief, Dickinson filed a petition for a writ of habeas corpus in federal district court, pursuant to 28 U.S.C. § 2254, asserting claims based on the erroneous instruction. The district court declined to excuse Dickinson's procedural default of these claims. In this appeal, Dickinson asks us to excuse his procedural default so that he can seek habeas relief on the basis of constitutionally ineffective assistance of trial counsel. We conclude that he has not established a basis to excuse the procedural default of these claims, and we affirm.

I

In 2011, Dickinson was indicted in Mohave County Superior Court on one count of attempted second-degree murder, two counts of aggravated assault, and one count of leaving the scene of an accident. The indictment alleged that the victim was riding his bicycle when Dickinson repeatedly

attempted to run over him with his truck. Dickinson pleaded not guilty to all counts.

At trial, Dickinson's counsel argued that Dickinson was not present when the crime occurred and that he was mistaken for the perpetrator. In his opening statement, Dickinson's counsel described how July 2, 2011 was a "perfectly ordinary day" for Dickinson, who spent the morning attending a swap meet and visiting a friend before returning home. "The next thing he knows, the police show up, he's being accused of a crime, he's being handcuffed behind his back and treated like a criminal, he's being thrown in the back of a cruiser, still not really sure what is going on."

During the State's case-in-chief, the victim testified that he had known Dickinson for over twenty years, that they were friends, and that he had loaned Dickinson "[a] weed eater and some other tools" to do "side jobs for yards and stuff." After the victim learned that Dickinson failed to complete a job despite accepting an advance payment, he decided he wanted his tools back, and the two friends had a falling-out when Dickinson refused to return them. The victim recounted that several weeks before the attack, the two got into a fistfight and Dickinson "pulled a knife on [him]" after the victim knocked Dickinson down.

The victim stated that on July 2, he "was riding [his] bike around" when he spotted Dickinson's truck in front of his friend Brett Altizer's house. The victim got off his bike and "walk[ed] by the truck," and then he saw Dickinson "pull[] out this ax, and he's coming at me," so the victim pulled out

a baseball bat he kept on his bike.[1]  He stated that Dickinson was cursing at him and "telling [him] he's going to kill [him]," but Altizer intervened and stopped the fight.  The victim "proceeded to put [his] bat away"; "eventually [Dickinson] put the ax away," and the victim "apologized to the guy for bringing problems to his house, . . . got on his bike[,] and rode away."

About ten minutes later, as he rode toward his house, he saw Dickinson driving his truck.  He testified:

> I looked up and I seen him, and the last thing in my head is, he smiled.  So next thing I know, he revved up his motor and he shot towards me.    And I remember what happened.  He hit the back of my bike, he had spun me all the way around about ten feet in the dirt.  I landed on the dirt. . . .

> [Then] this white truck pulls in front and stops him, I get back on my bike and I take off towards my house. . . .

> I got on my bike; I just took off riding. . . . I think I lost him, right; and all of a sudden I hear his motor revving up, and I look back and he's no more than maybe a foot from my bumper, and he's laughing, so I realize what's going on.

The victim tried to turn toward a fence, but as he described at trial, "When I go to do that, at the same time he turns his

---

[1] The victim stated that he regularly carried a bat for protection because "the area was really bad about dogs."

wheel and hit[s] my bike; and that's the last thing I remember, and I wake up in the hospital." The victim also recounted that during the attack, Dickinson "had that look in his face like, you know, he was going to kill me."

Altizer, who broke up the fight between Dickinson and the victim on his property shortly before the attack, testified that "[e]arlier that morning" on the day of the attack, Dickinson "said, 'I'm going to run him over.'" Altizer testified that after the attack Dickinson returned to his house, "tossed [him] the keys, and was saying something about 'he did it.'"

The jury also heard evidence that the victim sustained multiple injuries including a concussion, other head injuries requiring thirteen stitches, and a broken ankle, that his "funny bone was ripped out" from his elbow, and that his biceps and triceps muscles were separated from the bone in one arm.

Defense counsel did not call any witnesses or present any evidence. Instead, he focused on trying to undermine the credibility of the State's witnesses. For example, during his cross-examination of the victim, defense counsel elicited that the victim had a prior felony conviction, that the victim had been taking pain medications ever since the attack, and that the victim had filed a claim against Dickinson's insurance. Defense counsel also questioned the victim about the distance between him and the truck when he saw it during the attack, as well as how long the victim was able to see the driver.

Similarly, defense counsel attempted to discredit Robert Todd, an eyewitness who closely corroborated the victim's account of the attack, by questioning him at length about medications that he took, and casting doubt on whether the

witness got a good enough look at the driver of the truck to conclude it was Dickinson. Similarly, defense counsel extensively questioned the testifying police officers and investigators about their training, and about how they investigated this case.

In his closing argument, defense counsel offered an alternative account:

> What really happened—really happened was [Brett] Altizer, where Zane had left his truck and his keys, takes Zane's truck and is driving down the street they are talking about, and he struck [the victim]. Maybe he got frightened and he left the scene. [The victim] calls, because they are friends, we know they are friends. Brett told you that he was a friend of [the victim], or at least an acquaintance of [the victim]. So why didn't you stop? You hit me driving Zane's truck?
>
> And at that point it sinks in amongst the three of them, because Brett knew Zane had insurance, he told you that; but he had taken that truck without the owner's permission.

He asserted that Altizer and the victim then discussed the accident and decided to blame Dickinson. He also argued that there was "bad blood" between Dickinson and these witnesses, and that the victim's "chances are going to be quite a bit better with the insurance company if [Dickinson] is convicted of attempted murder, felony assault, leaving the scene of the accident by a jury of his peers." He spent the remainder of his argument attempting to undermine the other witnesses' credibility, discussing alleged "inconsistencies in

their stories," arguing that the police investigation was a "comedy of errors" involving "at least 12 substantial things they didn't do" properly, and arguing there was inadequate evidence of the extent of the victim's injuries.

At the conclusion of the three-day trial, the trial court instructed the jury on the second-degree murder charge as follows:

> The crime of attempted second degree murder has three elements. In order to find the defendant guilty of attempted second degree murder, you must find that, number one, the defendant intentionally did some act; and number two, the defendant believed such act was a step in the course of conduct planned to culminate in the commission of the crime of second degree murder; and number three, the defendant did so with the mental state required for the commission of the crime of second degree murder.

> It is not necessary that you find that the defendant committed the crime of second degree murder; only that he attempted to commit such crime.

> The crime of second degree murder has the following elements: Number one, the defendant caused the death of another person; and number two, the defendant either, A, did so intentionally or, B, knew that his conduct would cause death or serious physical injury.

By implying that a defendant could be guilty of attempted second-degree murder if he merely intended to cause serious physical injury, not death, this instruction contradicted Arizona precedent holding that "[t]he offense of attempted second-degree murder requires proof that the defendant intended or knew that his conduct would cause death." *State v. Ontiveros*, 81 P.3d 330, 333 (Ariz. Ct. App. 2003). However, Dickinson's counsel did not object to the instruction.

The jury returned a general verdict finding Dickinson guilty on all counts. The court imposed concurrent sentences of twelve years' imprisonment on the attempted second-degree murder count, and nine and seven years respectively on the two aggravated assault counts; it also imposed a two-year sentence, to be served consecutively to the other sentences, for leaving the scene of an accident.

On direct appeal, Dickinson was represented by a different attorney, and he challenged the attempted second-degree murder conviction, arguing that the jury instruction was erroneous under *Ontiveros*. Because Dickinson failed to preserve the issue for appeal, the Arizona Court of Appeals applied a "fundamental error" standard of review, placing the burden on Dickinson to "establish that (1) error exists, (2) the error is fundamental, and (3) the error caused him prejudice." *State v. Dickinson*, 314 P.3d 1282, 1285 (Ariz. Ct. App. 2013) (quotation marks and citation omitted). Although the Arizona Court of Appeals agreed that the instruction was erroneous and that the error was fundamental, it held that Dickinson had not carried his burden of showing prejudice. *Id.* at 1285–88. Dickinson and the State both unsuccessfully petitioned the Arizona Supreme Court for review.

Dickinson then filed a petition for state post-conviction relief through counsel, raising two claims that were both unrelated to the instructional error. The trial court denied relief on both claims. Dickinson filed a pro se petition for review with the Arizona Court of Appeals, arguing that his post-conviction counsel had represented him ineffectively. The Arizona Court of Appeals denied the petition, finding that the trial court had correctly denied relief on the two claims counsel raised and that Dickinson had no right to effective assistance of post-conviction counsel under Arizona law.

In February 2018, Dickinson filed a timely pro se petition pursuant to 28 U.S.C. § 2254 in federal district court, seeking a writ of habeas corpus. He raised two grounds for relief: (1) that the erroneous jury instruction violated his Fourteenth Amendment due process rights; and (2) that his trial counsel's failure to object to the jury instruction deprived him of his Sixth Amendment right to the effective assistance of counsel. While the petition was pending, Dickinson filed a motion for the appointment of counsel, which the magistrate judge granted.

After additional briefing, the magistrate judge issued a report and recommendation (R&R) in which she recommended that relief be denied as to Dickinson's due process claim and granted as to his ineffective assistance of counsel claim. She concluded that although both claims were procedurally defaulted, the default was excused as to the ineffective assistance claim under *Martinez v. Ryan*, 566 U.S. 1 (2012).

The district court accepted the magistrate judge's R&R as to Dickinson's due process claim but rejected it as to his ineffective assistance of counsel claim, thus denying relief on both grounds. The district court also disagreed with the

magistrate judge's prejudice analysis under *Strickland v. Washington*, 466 U.S. 668 (1984). The district court held that the relevant question was not whether Dickinson could have prevailed on appeal in obtaining a new trial, but only whether Dickinson would have prevailed at trial but for the error, and that Dickinson had not met *Strickland*'s standard for showing prejudice at trial. Because the district court concluded that Dickinson's ineffective assistance of trial counsel (IATC) claim was not "substantial" under *Martinez*, it denied Dickinson's claim, holding both that his procedural default was not excused and that the claim failed on the merits. However, the district court granted a certificate of appealability on "whether an inquiry into trial counsel's effectiveness under *Strickland* includes an evaluation of whether the direct appeal would have been different, but for trial counsel's missteps," and "whether *Strickland* in this context allows prejudice to be found solely because the court cannot know the legal theory under which the jury convicted the defendant." Dickinson timely appealed.

## II

We review "de novo a district court's decision regarding habeas relief, including questions regarding procedural default." *Jones v. Shinn*, 943 F.3d 1211, 1219–20 (9th Cir. 2019). "Ineffective assistance of counsel claims are mixed questions of law and fact which we also review de novo." *Id.* at 1220.

## III

We begin with an overview of the relevant legal framework before addressing Dickinson's arguments for excusing his procedural default. In general, "[f]ederal habeas courts reviewing convictions from state courts will not consider claims that a state court refused to hear based

on an adequate and independent state procedural ground." *Davila v. Davis*, 137 S. Ct. 2058, 2062 (2017); *see Coleman v. Thompson*, 501 U.S. 722, 747–48 (1991). However, the Supreme Court has recognized "a narrow exception" to this so-called procedural default rule when a petitioner "can establish 'cause' to excuse the procedural default and demonstrate that he suffered actual prejudice from the alleged error." *Davila*, 137 S. Ct. at 2062. The Court explained:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

*Martinez*, 566 U.S. at 17.[2]

To satisfy *Martinez*'s "cause" prong based on post-conviction counsel's failure to raise a claim, a petitioner must show that post-conviction counsel was ineffective under the standards of *Strickland*. *Martinez*, 566 U.S. at 14. A petitioner cannot satisfy this requirement if the underlying "ineffective-assistance-of-trial-counsel claim is insubstantial, *i.e.*, it does not have any merit or [] it is wholly without factual support, or [] the attorney in the initial-review collateral proceeding did not perform below constitutional standards." *Id.* at 16; *see Sexton v. Cozner*,

---

[2] Arizona courts appoint counsel at the defendant's request in any first collateral proceeding. *See* Ariz. R. Crim. P. 32.5(a)(1).

679 F.3d 1150, 1157 (9th Cir. 2012) ("[C]learly we cannot hold counsel ineffective for failing to raise a claim that is meritless."). "Accordingly, [post-conviction] counsel would not be ineffective for failure to raise an ineffective assistance of counsel claim with respect to trial counsel who was not constitutionally ineffective." *Sexton*, 679 F.3d at 1157. Similarly, to satisfy *Martinez*'s "prejudice" prong, a petitioner must "demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Martinez*, 566 U.S. at 14.[3]

In sum, "to establish cause and prejudice in order to excuse the procedural default of his ineffective assistance of trial counsel claim," a petitioner must demonstrate: "(1) post-conviction counsel performed deficiently; (2) 'there was a reasonable probability that, absent the deficient performance, the result of the post-conviction proceedings would have been different'; and (3) the 'underlying ineffective-assistance-of-trial-counsel claim is a substantial one.'" *Ramirez v. Ryan*, 937 F.3d 1230, 1242 (9th Cir. 2019) (internal citations omitted), *cert. granted sub nom. Shinn v. Ramirez*, No. 20-1009, 2021 WL 1951793 (U.S. May 17, 2021). Thus, whether Dickinson's procedural default is excused depends on the merits of his underlying IATC claim, and specifically, on whether Dickinson can show that he was prejudiced within the meaning of

---

[3] Notably, the *Martinez* "cause" and "prejudice" analyses overlap with each other because the determination whether there is a "reasonable probability that the result of the post-conviction proceedings would have been different" had post-conviction counsel raised an issue is "necessarily connected to the strength of the argument that trial counsel's assistance was ineffective." *Clabourne v. Ryan*, 745 F.3d 362, 377 (9th Cir. 2014), *overruled on other grounds by McKinney v. Ryan*, 813 F.3d 798, 818 (9th Cir. 2015) (en banc).

*Strickland* by his trial counsel's failure to object to the erroneous jury instruction.

## IV

Dickinson asserts two different theories in an effort to establish prejudice and excuse the procedural default of his claims—that he was deprived of a more favorable standard of review on appeal and that he was prejudiced at trial. We reject both arguments and affirm the district court on the ground that Dickinson has not presented a substantial IATC claim.

### A

Dickinson argues that his trial counsel's failure to object prejudiced him because it deprived him of a more favorable standard of review on direct appeal. While we affirm the district court's holding that Dickinson failed to show prejudice on this theory, we do so on a different basis than the one the district court articulated.

#### 1

The district court did not decide whether, as a general matter, "an inquiry into trial counsel's effectiveness under *Strickland* includes an evaluation of whether the appeal would have been different, but for trial counsel's missteps." Instead, it held that Dickinson could not have shown prejudice to his direct appeal in his state collateral proceedings because Arizona courts have rejected that approach. *See State v. Speers*, 361 P.3d 952, 960 (Ariz. Ct. App. 2015) (rejecting an IATC petitioner's argument that "framed the issue . . . in the context of counsel's failure to preserve [his] claims for appeal," reasoning that "[h]e is challenging his attorney's conduct at his trial, and must show

that [the attorney's] alleged unprofessional errors and omissions were sufficiently prejudicial that they 'undermine[d] confidence in the outcome' of that proceeding." (last alteration in original) (quoting *Strickland*, 466 U.S. at 694)).

Dickinson argues that this court "does not defer to Arizona law generally as to the interpretation of [federal] constitutional questions," and that Arizona courts' approach to analyzing *Strickland* prejudice is irrelevant to a federal habeas court's evaluation of an IATC claim. Although this is true, in analyzing whether Dickinson's procedural default is excused based on his state post-conviction counsel's failure to raise a ground for relief, it is nevertheless relevant to consider whether prevailing case law disfavored that ground. *See, e.g.*, *Jones v. Barnes*, 463 U.S. 745, 751–52 (1983) ("Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most a few key issues."); *cf. Smith v. Robbins*, 528 U.S. 259, 288 (2000) (explaining that while it is "possible to bring a *Strickland* claim based on counsel's failure to raise a particular claim, . . . it is difficult to demonstrate that counsel was incompetent" for failing to raise the claim).

Further complicating the matter, *Speers* was decided by Division Two of the Arizona Court of Appeals, while Dickinson's post-conviction proceedings took place in Division One. Thus, while *Speers* would have been persuasive "absent a decision by the Arizona Supreme Court compelling a contrary result," it would not have completely foreclosed Dickinson from obtaining state post-conviction relief with his prejudice-on-appeal theory. *Scappaticci v. Sw. Sav. & Loan Ass'n*, 662 P.2d 131, 136 (Ariz. 1983).

Rather than resolve these issues, we affirm the district court on the more general ground that as a matter of federal law, Dickinson cannot satisfy *Strickland*'s prejudice requirement for his IATC claim merely by showing that trial counsel's failure to object to a jury instruction deprived him of a more favorable standard of review on direct appeal.

2

Dickinson argues that under the *Strickland* prejudice analysis, we must consider not only whether his trial counsel's error undermines confidence in the jury's verdict, but also whether it "undermines confidence in the outcome of the direct appeal." To the extent these two inquiries might yield different answers (that is, that there is a reasonable probability that a petitioner may have prevailed on appeal but for counsel's error, but there is no reasonable probability that the jury's verdict would have been different), this approach would be contrary not only to the Supreme Court's prejudice analysis in *Strickland*, but also a steady line of subsequent cases holding that the IATC prejudice analysis focuses on the effect of an alleged error on the *verdict*—that is, on outcome of the trial. *See, e.g.*, *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993) (noting that *Strickland*'s prejudice inquiry "focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair"); *Walker v. Martel*, 709 F.3d 925, 941 (9th Cir. 2013) ("*Strickland* requires an actual finding that it is reasonably probable that, but for the unprofessional errors, the outcome *at trial* would have been different." (emphasis added)).[4]

---

[4] Thus, the Supreme Court has repeatedly cautioned that "the rules governing ineffective-assistance claims 'must be applied with

If we accepted Dickinson's theory of prejudice based on the loss of a more favorable standard of appellate review, we would be allowing an end run around *Strickland*'s stringent requirement of demonstrating that "but for counsel's unprofessional errors, the *result of the proceeding*"—not merely the defendant's *burden* during a *subsequent* proceeding—"would have been different." *Strickland*, 466 U.S. at 694 (emphasis added). We decline to adopt a theory that would expand prejudice beyond the Court's analysis in *Strickland*.

Dickinson cites *Roe v. Flores-Ortega*, 528 U.S. 470 (2000), to argue that "*Strickland* applies to 'counsel's performance during the course of a legal proceeding, either at trial *or on appeal*.'" In *Flores-Ortega*, after a defendant pleaded guilty to second-degree murder and was sentenced, his court-appointed trial counsel failed to file a timely notice of appeal. *Id.* at 473–74. The defendant subsequently sought federal habeas relief, alleging ineffective assistance of counsel based on his trial counsel's failure to file a notice of appeal. *Id.* at 474. The Supreme Court observed that "counsel has a constitutionally imposed duty to consult with the defendant about an appeal when there is reason to think

---

scrupulous care,'" *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1912 (2017) (citation omitted), lest "'[a]n ineffective-assistance claim . . . function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial,' thus undermining the finality of jury verdicts," *id.* (first alteration in original) (quoting *Harrington v. Richter*, 562 U.S. 86, 105 (2011)). *See also Premo v. Moore*, 562 U.S. 115, 122 (2011) ("An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial . . . , and so the *Strickland* standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve." (quoting *Strickland*, 466 U.S. at 689–90)).

either (1) that a rational defendant would want to appeal . . . , or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing." *Id.* at 480. The Court further held that "to show prejudice in these circumstances, a defendant must demonstrate that there is a reasonable probability that, but for counsel's deficient failure to consult with him about an appeal, he would have timely appealed." *Id.* at 484.

The Court explained that although *Strickland*'s prejudice prong ordinarily requires a "defendant to demonstrate that the errors 'actually had an adverse effect on the defense,'" *id.* at 482 (quoting *Strickland*, 466 U.S. at 693), this case was "unusual in that counsel's alleged deficient performance arguably led not to a judicial proceeding of disputed reliability, but rather to the forfeiture of a proceeding itself," *id.* at 483. Under these unique circumstances, the Court reasoned, the "denial of the entire judicial proceeding itself, which a defendant wanted at the time and to which he had a right, . . . demands a presumption of prejudice. Put simply, we cannot accord any presumption of reliability to judicial proceedings that never took place." *Id.* (internal quotation marks and citation omitted).

*Flores-Ortega* does not support Dickinson's argument that the loss of a more favorable standard of appellate review due to counsel's failure to object to a jury instruction satisfies *Strickland*'s prejudice prong. Counsel's failure to object to a jury instruction did not "deprive[]" Dickinson of "an appeal altogether." *Id.* Instead, ordinary trial errors like this fall under the general rule that the Supreme Court carefully reiterated and distinguished on the facts in *Flores-Ortega*: "We normally apply a strong presumption of reliability to judicial proceedings and require a defendant to overcome that presumption by showing how specific errors

of counsel undermined the reliability of the finding of guilt."
*Id.* at 482 (alteration adopted) (internal quotation marks and
citations omitted).  Indeed, Dickinson does not argue that the
failure to object to a jury instruction is an error of such
"magnitude" that it calls for "presum[ing] prejudice."  *Id.*
Instead, he cites *Flores-Ortega* to argue that a defendant can
show he was prejudiced by trial counsel's deficient
performance based solely on the loss of a more favorable
standard of review in appellate proceedings.  But nothing in
*Flores-Ortega* supports this argument.[5]

However, the Eleventh Circuit's reasoning in *Davis v.
Secretary for the Department of Corrections*, 341 F.3d 1310
(11th Cir. 2003) is instructive on the issue of when the
outcome of an appeal is relevant to the prejudice inquiry for
an IATC claim.  In *Davis*, defense counsel objected to the
state's repeated peremptory strikes of black jurors during
voir dire, but then failed to renew his objection at the
conclusion of voir dire as required under Florida law to
preserve a *Batson* challenge for appeal.  *Id.* at 1314–15.  On
federal habeas review, the Eleventh Circuit held that trial

---

[5] Dickinson also cites *Garza v. Idaho*, 139 S. Ct. 738 (2019), to
support his theory of prejudice on appeal, but that case is similarly
inapposite.  In *Garza*, the Court merely extended *Flores-Ortega*'s
holding to situations when "the defendant has, in the course of pleading
guilty, signed . . . an appeal waiver."  *Id.* at 742 (quotation marks and
citation omitted).  The Court held that "when an attorney's deficient
performance costs a defendant an appeal that the defendant would have
otherwise pursued," the "presumption of prejudice recognized in *Flores-
Ortega* applies regardless of whether the defendant has signed an appeal
waiver."  *Id.*  The Court relied on the same reasoning as in *Flores-
Ortega*, explaining that when trial counsel's error entirely deprives a
defendant of an appellate proceeding, *Strickland* prejudice does not
depend "on proof that the defendant's appeal had merit."  *Id.* at 748.  This
holding is unhelpful to Dickinson's argument for the same reasons the
holding in *Florez-Ortega* is unhelpful.

counsel had "performed deficiently in failing, as required by [Florida law], to renew [defendant's] *Batson* challenge before accepting the jury." *Id.* at 1314. The court went on to consider whether, under *Strickland*, it should assess prejudice based on the impact the error had on the trial or on the appeal. *Id.* It concluded that the appropriate focus was prejudice on appeal, likening counsel's failure to renew the objection to the attorney's failure to file a notice of appeal in *Flores-Ortega*:

> As in *Flores-Ortega*, the attorney error Davis identifies was, by its nature, unrelated to the outcome of his trial. To now require Davis to show an effect upon his trial is to require the impossible. Under no readily conceivable circumstance will a simple failure to preserve a claim—as opposed to a failure to raise that claim in the first instance—have any bearing on a trial's outcome. Rather, as when defense counsel defaults an appeal entirely by failing to file a timely notice, the only possible impact is on the appeal.
>
> Accordingly, when a defendant raises the unusual claim that trial counsel, while efficacious in raising an issue, nonetheless failed to preserve it for appeal, the appropriate prejudice inquiry asks whether there is a reasonable likelihood of a more favorable outcome on appeal had the claim been preserved.

*Id.* at 1315–16. The Eleventh Circuit's distinction between "a simple failure to preserve a claim" and "a failure to raise

that claim in the first instance" aptly illustrates why *Flores-Ortega*'s narrow holding does not apply to Dickinson's IATC claim. *Id.* Dickinson's claim, based on his trial counsel's failure to object to a jury instruction, is not the sort of "unusual claim that trial counsel, while efficacious in raising an issue, nonetheless failed to preserve it for appeal." *Id.* at 1316. Unlike the circumstances in either *Flores-Ortega* or *Davis*, it is entirely possible to analyze the prejudice of an unobjected-to jury instruction upon the outcome of the trial itself.

Dickinson also argues that the Second, Third, and Fifth Circuits, along with this circuit in an unpublished memorandum disposition, have held "that prejudice exists where trial counsel's failure to preserve an issue for appeal prejudiced the outcome of the appeal." But, as we explain next, none of the decisions he cites support this proposition.

Dickinson first cites *Parker v. Ercole*, 666 F.3d 830 (2d Cir. 2012) (per curiam), in which a § 2254 petitioner argued that his trial counsel had ineffectively failed to preserve a sufficiency-of-the-evidence objection for appeal after the jury returned a guilty verdict. *Id.* at 832. Because the objection would not have affected the trial itself, and the trial court would have reviewed such an objection using the same standards as the appellate court, the Second Circuit noted without analysis that the prejudice prong depended on whether, "but for his counsel's failure to preserve his sufficiency claim, there is a reasonable probability that the claim would have been considered on appeal and, as a result, his conviction would have been reversed." *Id.* at 834. The Second Circuit did not, however, suggest that the loss of a more favorable standard of appellate review could satisfy *Strickland*'s prejudice requirement.

He also cites *Rogers v. Quarterman*, 555 F.3d 483 (5th Cir. 2009), where the Fifth Circuit considered the argument by a § 2254 petitioner, convicted while still a minor, that "he was prejudiced by defense counsel's mistake" in failing to object to the admission of his confession on voluntariness grounds. *Id.* at 495. Although Texas law did not favor such a challenge, the petitioner nonetheless argued that counsel's failure to object (and thus preserve the issue for appeal) prejudiced him "because his inability to appeal the voluntariness of his confession made it impossible for an appellate court to adopt a new rule requiring parental access during juvenile interrogation," which—if adopted—would have rendered his confession inadmissible. *Id.*

In rejecting this argument, the Fifth Circuit did not address whether a petitioner could show prejudice based on the loss of more favorable appellate review. *See id.* It simply held that the petitioner did not suffer the prejudice he claimed, reasoning that "[t]his court has no reason to speculate that a Texas appellate court would impose additional *per se* requirements to further protect juveniles," and that absent such a rule, "there is no reasonable likelihood that the Fourteenth Court of Appeals, the Texas Court of Criminal Appeals, or the United States Supreme Court would have found the confession to be involuntary or inadmissible had that issue been properly before it." *Id.* The Fifth Circuit's brief discussion of how an objection might have been resolved had it not been waived—in the course of concluding that counsel's failure to object did *not* prejudice the petitioner—does not support Dickinson's argument that the loss of a more favorable standard of review constitutes *Strickland* prejudice.

Dickinson also cites *Government of the Virgin Islands v. Vanterpool*, 767 F.3d 157 (3d Cir. 2014), but this decision

does not address the possibility of trial counsel's error prejudicing a defendant on appeal. Instead, the Third Circuit held that a § 2254 petitioner's trial counsel prejudiced him by failing to assert a First Amendment challenge to a criminal statute because "had [his] attorney raised the issue to the trial court, [the statute] would likely have been found unconstitutional." *Id.* at 168. The Third Circuit did not discuss whether this constitutional challenge would have succeeded at trial or on appeal; it simply concluded that "the First Amendment challenge would have been viable had it been raised during trial." *Id.* at 160. Moreover, because the First Amendment challenge would have invalidated the statute of conviction, the prejudice analysis in *Vanterpool* certainly does not support Dickinson's argument that an error may fall short of undermining confidence in the outcome of the trial, but nevertheless satisfy *Strickland*'s prejudice prong simply by depriving the defendant of a more favorable appellate standard of review.

Finally, Dickinson argues that in *Burdge v. Belleque*, 290 F. App'x 73 (9th Cir. 2008), an unpublished memorandum disposition, the Ninth Circuit granted "habeas relief because trial counsel's failure to preserve what would have been a meritorious issue on appeal was prejudicial." In *Burdge*, a defendant's trial counsel failed to object to the application of a state sentencing provision that the Oregon Court of Appeals subsequently ruled was inapplicable to defendants who, like him, had no felony convictions at the time they committed the relevant offense. *Id.* at 76.

On federal habeas review, a panel of this court held that the Oregon Supreme Court had unreasonably applied *Strickland* in denying the defendant's IATC claim. *Id.* at 77. The panel concluded that counsel's failure to object to the application of the sentencing provision clearly constituted

deficient performance and that the petitioner was prejudiced because, given the state of Oregon law on the sentencing provision, "if counsel had objected to [its] applicability . . . , either the sentencing judge would have agreed with the objection, or the issue would have been preserved for appeal." *Id.* at 79.

*Burdge* does not support Dickinson's argument.[6]  The court in *Burdge* did not analyze whether the loss of a more favorable standard of appellate review satisfies *Strickland*'s prejudice prong for deficient performance by trial counsel. Instead, it simply concluded that if trial counsel had objected to the sentencing error, "either the sentencing judge would have agreed with the objection, or the issue would have been preserved for appeal." *Id.*  To be sure, in a certain sense, the forfeiture of an issue for appeal is relevant to analyzing the prejudice of trial counsel's failure to object because we assume that if trial counsel had objected and the trial court erroneously overruled the objection, the error would have been corrected on appeal.  But that is simply to say that when assessing whether a defendant was prejudiced by trial counsel's failure to object, we assume axiomatically that the objection, if raised, would have been correctly ruled upon.

This is apparently what the *Burdge* panel meant when it concluded that "either the sentencing judge would have agreed with the objection, or the issue would have been preserved for appeal." *Id.*  This also helps clarify why the Second and Third Circuits discussed how an unraised

---

[6] Moreover, as a memorandum disposition, *Burdge* is "at best, persuasive authority." *Hines v. Youseff*, 914 F.3d 1218, 1230 (9th Cir. 2019).  And even assuming the panel in *Burdge* implicitly endorsed Dickinson's position, it did so in passing, without any analysis that could persuasively support Dickinson's argument.

objection might have fared *on appeal*, even though a trial court would have initially ruled on it.  *See Vanterpool*, 767 F.3d at 168 ("[H]ad Vanterpool's attorney raised the issue to the trial court, Section 706 would likely have been found unconstitutional.  By virtue of his trial counsel's failure to *preserve* a viable First Amendment challenge, Vanterpool has satisfied the second prong of the *Strickland* test." (emphasis added)); *Parker*, 666 F.3d at 834 ("Parker must show that, but for his counsel's failure to preserve his sufficiency claim, there is a reasonable probability that the claim would have been considered *on appeal* and, as a result, his conviction would have been reversed." (emphasis added)).  But these cases do not support the argument that the loss of an appellate standard of review can itself constitute prejudice under *Strickland*.

\*     \*     \*

Given the clear weight of authority against Dickinson's argument, and considering that no court has adopted it, we find his prejudice-on-appeal theory unpersuasive.  We hold that Dickinson cannot satisfy *Strickland*'s prejudice requirement for an IATC claim for failure to object to a jury instruction based on the consequent loss of a more favorable standard of appellate review.

B

We next consider Dickinson's argument that his IATC claim is substantial because his trial counsel's failure to object to the erroneous instruction prejudiced him at trial.  Specifically, Dickinson asserts that "at least one juror could have relied on the invalid portion of the instruction and convicted him of attempted second-degree murder based on a finding that his intent was only to injure, and not to kill" the victim.  We find this argument unpersuasive.

As an initial matter, unlike Dickinson's prejudice-on-appeal theory that we rejected in the preceding section, and which would have implicated Arizona state courts' harmless error standard, this theory of prejudice turns directly on *Strickland*'s standard. *See Musladin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009). To establish prejudice under *Strickland*, Dickinson must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Although Dickinson correctly observes that counsel's error need not be "outcome-determinative" to constitute ineffective assistance, *id.* at 697, "[t]he likelihood of a different result must be substantial, not just conceivable," to satisfy *Strickland*'s prejudice prong, *Harrington*, 562 U.S. at 112 (citation omitted). Thus, when the Supreme Court declined to adopt a more stringent "outcome-determinative test" for prejudice in *Strickland*, it explained that the difference between this standard and the "substantial likelihood" test is so small that it "should alter the merit of an ineffectiveness claim only in the rarest case." *Strickland*, 466 U.S. at 697.[7]

When Dickinson challenged the erroneous jury instruction on direct appeal, the Arizona Court of Appeals held that he failed to "affirmatively prove prejudice" by "show[ing] that a reasonable, properly instructed jury could have reached a different result," as Arizona law required for him to prevail on a forfeited jury instruction challenge. *Dickinson*, 314 P.3d at 1286 (internal quotation marks and

---

[7] Dickinson argues that the district court erred by requiring him to show "that the outcome of his trial *would* have been different with a properly instructed jury," "not that it *could* have been different." As we explain below, the district court applied the proper test for *Strickland* prejudice.

citations omitted). The Arizona Court of Appeals found that at trial, "[t]he State's theory was that Dickinson intended to kill the victim, not that he intended to cause physical injury or knew that his conduct would cause serious physical injury." *Id.* It also found that Dickinson never asserted a lack-of-intent defense, but instead solely asserted mistaken identity. *Id.* Finally, it found that the jury heard significant evidence that Dickinson intended to kill the victim, and no firsthand evidence that Dickinson intended only to cause serious injury. *Id.* at 1286–87. The court found nothing to "suggest[] that Dickinson intended to cause serious injury to the victim (as opposed to kill him), which is the fundamental error in the jury instructions." *Id.* at 1288.

We must accept the Arizona Court of Appeals' factual findings about Dickinson's trial unless rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Runningeagle v. Ryan*, 686 F.3d 758, 763 n.1 (9th Cir. 2012).[8] The record amply supports the Arizona Court of Appeals' characterization of the trial, and considering these facts, Dickinson cannot demonstrate a reasonable probability that the trial would have had a different outcome without the erroneous jury instruction. The jury heard overwhelming evidence that Dickinson intended to kill the victim, it heard only a few passing comments that it could

---

[8] The Arizona Court of Appeals' legal conclusion regarding prejudice was based on state law's "fundamental error" standard, not *Strickland*'s standard for prejudice. No state court ruled on the merits of Dickinson's IATC claim, and thus we do not apply AEDPA deference to any legal conclusion of the state courts regarding prejudice. Nevertheless, we owe deference to the state court's factual findings. *See Kirkpatrick v. Chappell*, 950 F.3d 1118, 1131 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 561 (2020) ("Unlike § 2254(d), § 2254(e)(1)'s application is not limited to claims adjudicated on the merits. Rather, it appears to apply to all factual determinations made by state courts.").

have conceivably construed as evidence that Dickinson did not intend to kill the victim, and neither the State nor defense counsel ever suggested that Dickinson intended only to cause serious physical injury.

First, overwhelming evidence supported the conclusion that Dickinson intended to kill the victim. Both the victim and Altizer described at length how Dickinson had brandished an ax and told the victim that he was "going to kill [him]" minutes before the attack. Describing the attack, the victim stated, "[T]he first time he clipped me . . . he had that look in his face like, you know, he was going to kill me, man, he was going to kill me . . . ." Todd testified that when Dickinson "proceeded to run [the victim] down on his bicycle," the victim "was drug [sic] underneath the truck." The jury also heard testimony from multiple witnesses that after the initial impact between the truck and the victim's bicycle, Dickinson backed up, revved his engine, and accelerated toward the victim.

Second, only a handful of passing remarks by witnesses at trial could have supported the theory that Dickinson had any intent other than to kill. Altizer speculated that when Dickinson said, "I'm going to run him over," he meant it "jokingly." On the occasions when Dickinson pulled a knife and an ax on the victim, he ultimately did not use those weapons. And Altizer's testimony that after the attack Dickinson tossed him the keys and said "[t]hat he done it" could suggest that Dickinson only intended to injure the victim, assuming that Dickinson realized at the time that what "he [had] done" was merely injure, not kill, the victim.[9]

---

[9] Dickinson also cites several statements from the trial judge outside the presence of the jury to argue that "the trial judge doubted the strength

Significantly, however, even if the defense could have marshalled this scant evidence into an argument that Dickinson lacked the intent to kill, it never did so. Defense counsel never questioned a single witness about whether Dickinson intended to kill the victim, nor did he present any evidence that Dickinson intended to do something other than kill him, such as maim, injure, or scare him. In the same vein, defense counsel's opening and closing arguments never even hinted at the possibility that Dickinson intended only to seriously injure the victim. Instead, they focused almost exclusively on whether the Dickinson was in fact the driver and whether Dickinson's alibi was valid. As defense counsel characterized his closing argument to the jury:

> [I]f my closing had a title, I suppose it would be the mysterious injury of [the victim]. While there's no doubt that [the victim] suffered some kind of injury of some type that day, he went to the hospital, what is in doubt and what the question is, the who, the what, the when, the where, and the how and the why; because it is those questions that creates [sic] uncertainty, and it's that uncertainty that lends the mysteriousness to the title of my closing.

---

of the evidence that Dickinson intended to either seriously injure *or* kill [the victim]." For example, the trial judge stated during sentencing, "I have seen cases in which I thought serious physical injures [sic] were a whole lot worse than those that were suffered by [the victim], although I would certainly not volunteer to get run over by a vehicle in the manner that he did." But these statements are irrelevant to the question before us: whether there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

In contrast, the State focused almost exclusively on the theory that Dickinson intended to kill the victim. The State's first words to the jury during its opening statement were, "Good afternoon. The evidence in this case will show you that the defendant, Zane Dickinson, tried to kill [the victim]." It emphasized this theme throughout the trial. The only statement during opening or closing arguments that might have led the jury to consider whether Dickinson intended to cause serious physical injury was an offhand remark by the State, near the beginning of its closing argument, that Dickinson "knew that his conduct would result in death or serious physical injury."[10] Apart from this paraphrase of the erroneous jury instruction, the State exclusively argued that the evidence showed Dickinson intended to kill the victim. It repeatedly emphasized that because an automobile can be a deadly weapon, running somebody over suggests an intent to kill:

- "This could have been much worse; [the victim's] injuries could have been much worse. You get spit through underneath a truck, could have been much worse. But he was trying to kill him."

- "[Y]ou guys, your common experience and life experience, you know, that people get killed when they get ran [sic] over. Backing

---

[10] The State also made a single brief reference in its opening statement to a recorded jail call in which Dickinson's mother apparently stated that a friend heard Dickinson "was just trying to scare [the victim]." However, the record does not include a transcript of this call, and Dickinson makes no reference to it in his briefing.

out, someone gets backed over, people get killed at low speeds."

- "The context is clear.  The defendant was there.  He ran the victim over.  And he should have stopped.  But again, he was trying to kill him, so why would he stop?"

- "[W]hen you're trying to kill somebody and run them over, I mean it's—what do you expect?"

The State also repeatedly emphasized Dickinson's threats to kill the victim:

- "Now, what the evidence will show you is that [Dickinson] was trying to kill [the victim].  Told him he was going to kill him up here, with the ax; then he went looking for him in his truck, and he didn't just try once, took him to the second time before he finally got him."

- "[I]n that dispute, the defendant grabbed an ax out of the truck and told the victim that he was going to fucking kill him."

- "Remember he said he was going to fucking kill him . . . ."

Dickinson attempts to discount these statements by asserting that "arguments of counsel cannot substitute for instructions by the court," *Taylor v. Kentucky*, 436 U.S. 478, 488–89 (1978).  To be sure, attorneys' remarks during opening and closing argument do not absolve a trial court of its duty to properly instruct the jury.  Thus, in *Taylor*, a direct

proceeding in which the defendant argued that his trial was fundamentally unfair because the court refused to instruct the jury on the presumption of innocence, the Supreme Court rejected the state's argument that "no additional instructions were required, because defense counsel argued the presumption of innocence in both his opening and closing statements." *Id.* at 488.

But *Taylor* addressed only whether "the trial court's refusal to give petitioner's requested instruction on the presumption of innocence resulted in a violation of his right to a fair trial as guaranteed by the Due Process Clause of the Fourteenth Amendment," *id.* at 490, not whether there is a reasonable probability that the jury would have returned a different verdict but for counsel's failure to object to an instruction on the definition of a crime, *see Strickland*, 466 U.S. at 694. We routinely consider the trial record in its entirety to determine whether an attorney's deficient performance prejudiced a defendant, and Dickinson cites no authority holding that it is improper to do so. *See, e.g.*, *Hardy v. Chappell*, 849 F.3d 803, 821 (9th Cir. 2016) (holding that "[u]nder no reasonable reading of the record could it be concluded the jury actually found [petitioner] guilty under an aid-or-abet theory" despite the inclusion of an aid-and-abet instruction, in part because "[w]hen the prosecutor addressed the aid-and-abet theory in his closing argument, he described only [other defendants'] involvement—*not* [petitioner's]"); *Zapata v. Vasquez*, 788 F.3d 1106, 1117 (9th Cir. 2015) ("Here, the totality of the circumstances shows the California Court of Appeal's prejudice determination was unreasonable.").

In sum, the jury heard overwhelming evidence that Dickinson intended to kill the victim, the State argued exclusively (with the exception of reciting the erroneous jury

instruction once at the beginning of its closing argument) that Dickinson intended to kill the victim, and Dickinson's attorney gave the jury no reason to consider the possibility that he intended only to cause serious physical injury.[11]  This does not merely show, as Dickinson argues, that the jury "*could* have convicted [him] based on the valid theory" of intent to kill, *Riley v. McDaniel*, 786 F.3d 719, 726 (9th Cir. 2015).  Rather, it shows that "we can be reasonably certain . . . that the jury *did* convict [him] based on" that theory.  *Id.* (alterations in original).  If a juror had voted to convict based on the invalid "serious physical injury" theory, he would have had to entirely disregard Dickinson's actual defense, disbelieve the State's strong argument that Dickinson intended to kill, and form his own idiosyncratic theory of the case, never actually discussed at trial, by picking a handful of stray remarks out of two days of witness testimony.  While perhaps conceivable, this scenario is not reasonably probable.  *See Strickland*, 466 U.S. at 694.

Dickinson relies on a single Fifth Circuit decision, *Gray v. Lynn*, 6 F.3d 265 (5th Cir. 1993), to argue that notwithstanding the trial record, he was prejudiced by counsel's failure to object to the erroneous jury instruction. We are not persuaded that we should apply *Gray* to conclude that Dickinson was prejudiced at trial.

In *Gray*, a jury found the defendant guilty of first-degree murder after hearing evidence that he had appeared at a couple's door holding a gun, told the man who answered the door that he was going to "blow [his] brains out," and hit him

---

[11] In addition, the trial judge gave the jurors the opportunity to submit questions to the witnesses during trial, and nothing in the record suggests that any of the jurors submitted a question to probe whether Dickinson intended to kill or merely to inflict serious physical injury.

on the side of the head with the gun. *Id.* at 267. He then entered their bedroom, struck the woman and the man with his gun, and got into a struggle with the man during which he fired three shots at the man at close range, all of which missed. *Id.* The jury was erroneously instructed that "[a]n essential element of the offense of attempted first degree murder is specific criminal intent to kill or inflict great bodily harm." *Id.* at 269 (alteration in original). Gray's counsel failed to object to this instruction, *id.*, and on federal habeas review, the Fifth Circuit concluded that counsel's failure constituted ineffective assistance, *id.* at 271–72.

Assessing *Strickland*'s prejudice prong, the Fifth Circuit framed its inquiry as "whether there is a reasonable probability that the jury would have had a reasonable doubt respecting Gray's guilt if the phrase 'or inflict great bodily harm' had not been included in the charge." *Id.* at 269–70. The court concluded that there was prejudice, noting that after threatening to "blow" the victim's "brains out," Gray proceeded to strike him on the head with the gun "instead of immediately firing the gun in order to carry out that threat." *Id.* at 270. The court reasoned:

> The jury plausibly could have interpreted this evidence in at least two ways: (1) Gray *intended to kill* James by shooting him with the gun, but did not succeed; or (2) Gray *intended to inflict great bodily harm* on James by striking him and shooting him with the gun. Considering the circumstances, including the fact that Gray did not take advantage of several golden opportunities to kill James if he had intended to do so, we think there is at least a reasonable probability that the jury could have had a reasonable

doubt about Gray's intent to kill, and that it convicted him instead on the basis of the erroneous instruction, because it found that he had the intent to inflict great bodily harm.

*Id.*

As an initial matter, contrary to Dickinson's assertion, *Gray* is not "squarely on point." In *Gray*, although the defendant knew both the victims and had previously lived with one of them, *id.* at 267 & nn. 3, 4, there is no indication that the defendant had previously threatened to kill either of the victims or pulled a deadly weapon on them, as Dickinson did. Furthermore, the male victim in *Gray* testified that "he believed that, at that close range, Gray was capable of carrying out the threat" to "blow [his] brains out," even though he did not carry it out. *Id.* at 267. There was no comparable testimony at Dickinson's trial that could have led the jury to infer that Dickinson was fully capable of carrying out his threat to kill, but instead chose to maneuver his truck just so as to maim the victim.

Dickinson argues that, like the defendant in *Gray*, he "did not take advantage of several golden opportunities to kill" the victim—apparently referring to the instances when he pulled a knife and an ax on the victim—and therefore, the jury could have reasonably doubted his intent to kill. *See id.* at 270. He also observes that because he "only hit the back of [the victim's] bike initially," and did not hit the victim a second time until the victim tried to turn off the road, the jury could have found that he did not intend to kill the victim with his truck. While this is perhaps "conceivable," the possibility that an attempted murder could have been carried out more efficiently and brutally does not cast serious doubt on the attacker's intent. *See Hardy*, 849 F.3d at 819 ("A

reasonable probability . . . must be substantial, not just conceivable.").

Indeed, the facts here are more closely analogous to a subsequent Fifth Circuit case, *Harris v. Warden, Louisiana State Penitentiary*, 152 F.3d 430 (5th Cir. 1998), in which the defendant repeatedly stabbed a victim, ordered her into the trunk of his car, and threatened to "finish [her] off," *id.* at 432. She was eventually rescued and "transported to the hospital with several life-threatening wounds," but she survived after receiving intensive medical care. *Id.* at 433. A jury convicted the defendant of attempted second-degree murder after receiving an instruction similarly erroneous to the one in *Gray*, and the defendant sought federal habeas relief based on his attorney's failure to object to the instruction. *Id.* at 433–34.

The Fifth Circuit distinguished *Gray* and held that the erroneous instruction did not prejudice the defendant, reasoning that while the defendant in *Gray* "failed to take advantage of . . . 'golden opportunities'" to kill the victim "and did not pursue the victim when he ran off," this defendant did take advantage of the opportunity to kill the victim and simply failed:  he "inflicted life-threatening stab wounds . . . and basically left her for dead in the trunk of his car. Not only is [his] leaving [the victim] for dead probative of an intent to kill, but [his] deliberate use of a deadly weapon in a manner likely to cause death further supports the inference that he intended to kill [her]." *Id.* at 439. While Dickinson did not injure his victim as severely as the defendant in *Harris* injured his victim, his case is more akin to *Harris* than it is to *Gray* because Dickinson acted on his threat—albeit unsuccessfully—by "deliberate[ly] us[ing] . . . a deadly weapon in a manner likely to cause death" and then leaving his injured victim. *Id.*

More fundamentally, however, we find *Gray* unpersuasive because it appears to have applied the wrong rule in its *Strickland* prejudice analysis. Although the Fifth Circuit initially described its prejudice inquiry as turning on "whether there is a reasonable probability that the jury would have had a reasonable doubt respecting Gray's guilt if the phrase 'or inflict great bodily harm' had not been included in the charge," *Gray*, 6 F.3d at 269–70, it transitioned from this correct formulation of the *Strickland* standard to a different and lower standard, unsupported by *Strickland*: whether the jury "plausibly could have interpreted" the evidence to support Gray's innocence absent the erroneous instruction, *id.* at 270; *see also id.* at 271 ("Under the court's instructions, the jury *could* have convicted Gray for attempted first degree murder on the basis of a finding that he had the intent to inflict great bodily harm, even if it had a reasonable doubt that he had the specific intent to kill James." (emphasis added)).

This circuit and others have explicitly rejected this approach of finding prejudice simply because a jury conceivably *could* have convicted based on an improper instruction. *See, e.g.*, *Hardy*, 849 F.3d at 819 ("A reasonable probability . . . must be substantial, not just conceivable." (quoting *Strickland*, 466 U.S. at 693–94)); *Benge v. Johnson*, 474 F.3d 236, 249 (6th Cir. 2007) ("What Benge *could have* done, however, is irrelevant at this stage in the proceedings. We must be able to say that a reasonable probability exists that a properly instructed jury *would have* concluded that Benge had shown [an affirmative defense] by the preponderance of the evidence.").[12]

---

[12] Dickinson observes that this circuit cited *Gray*'s prejudice analysis favorably in *United States v. Span*, 75 F.3d 1383 (9th Cir. 1996),

The record leaves no room for "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Therefore, we hold that Dickinson has failed to demonstrate a substantial IATC claim, and accordingly, his procedural default of that claim is not excused under *Martinez*.

V

We **AFFIRM** the district court's denial of Dickinson's petition for a writ of habeas corpus.

---

but it did so only in passing for the proposition that prejudice can occur "even though both the prosecutor and defense counsel argued the correct law to the jury," *id.* at 1390. In *Span*, the trial court failed to give an excessive force instruction and instead gave another instruction specifically precluding an excessive force defense in a trial for assaulting federal officers. Based on the trial testimony of two witnesses, we concluded it was "highly likely that a properly instructed jury would have found that the Spans were not the first aggressors, but only defending themselves against an excessive and outrageous use of force by the marshals." *Id.*